## CARROLL ET AL. *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 15.   Argued December 4, 1923; restored to docket for reargument January 28, 1924; reargued March 14, 1924.—Decided March 2, 1925.

1. The legislative history of § 6 of the act supplemental to the National Prohibition Act, November 23, 1921, c. 134, 42 Stat. 223, which makes it a misdemeanor for any officer of the United States to search a private dwelling without a search warrant or to search any other building or property without a search warrant, maliciously and without reasonable cause, shows clearly the intent of Congress to make a distinction as to the necessity for a search warrant in the searching of private dwellings and in the searching of automobiles or other road vehicles, in the enforcement of the Prohibition Act.  P. 144.

2. The Fourth Amendment denounces only such searches or seizures as are unreasonable, and it is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.  P. 147.

3. Search without a warrant of an automobile, and seizure therein of liquor subject to seizure and destruction under the Prohibition Act, do not violate the Amendment, if made upon probable cause, i. e., upon a belief, reasonably arising out of circumstances known to the officer, that the vehicle contains such contraband liquor.  P. 149.

4. Various acts of Congress are *cited* to show that, practically since the beginning of the Government, the Fourth Amendment has been construed as recognizing a necessary difference between a search for contraband in a store, dwelling-house, or other struc-

ture for the search of which a warrant may readily be obtained, and a search of a ship, wagon, automobile, or other vehicle which may be quickly moved out of the locality or jurisdiction in which the warrant must be sought. P. 150.

5. Section 26, Title II, of the National Prohibition Act, provides that when an officer " shall *discover* any person in the act " of transporting intoxicating liquor in any automobile, or other vehicle, in violation of law, it shall be his duty to seize the liquor and thereupon to take possession of the vehicle and arrest the person in charge of it, and that, upon conviction of such person, the court shall order the liquor destroyed, and, except for good cause shown, shall order a public sale, etc. of the other property seized. *Held:*

(*a*) That the primary purpose is the seizure and destruction of the contraband liquor, and the provisions for forfeiture of the vehicle and arrest of the transporter are merely incidental. P. 153.

(*b*) Hence the right to search an automobile for illicit liquor and to seize the liquor, if found, and thereupon to seize the vehicle also and to arrest the offender, does not depend upon the right to arrest the offender in the first instance, and therefore it is not determined by the degree of his offence,—whether a misdemeanor under § 29, Title II of the Act, because of being his first or second offence, or a felony because it is his third; and the rule allowing arrest without warrant for misdemeanor only when the offence is committed in the officer's presence, but for a felony when the officer has reasonable cause to believe that the person arrested has committed a felony, is not the test of the validity of such search and seizure. Pp. 155, 156.

(*c*) The seizure is legal if the officer, in stopping and searching the vehicle, has reasonable or probable cause for believing that contraband liquor is being illegally transported in it. P. 155.

(*d*) The language of § 26,—when an officer shall " discover " any person in the act of transporting, etc.,—does not limit him to what he learns of the contents of a passing automobile by the use of his senses at the time. P. 158.

(*e*) The section thus construed is consistent with the Fourth Amendment. P. 159.

6. Probable cause *held* to exist where prohibition officers, while patrolling a highway much used in illegal transportation of liquor, stopped and searched an automobile upon the faith of information previously obtained by them that the car and its occupants, identified by the officers, were engaged in the illegal business of " bootlegging." P. 159.

7. When contraband liquor, seized from an automobile and used in the conviction of those in charge of the transportation, was shown at the trial to have been taken in a search justified by probable cause, *Held* that the court's refusal to return the liquor on defendants' motion before trial, even if erroneous because probable cause was not then proven, was not a substantial reason for reversing the conviction. P. 162.

8. The Court notices judicially that Grand Rapids is about 152 miles from Detroit, and that Detroit, and its neighborhood along the Detroit River, which is the international boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. P. 160.

Affirmed.

This is a writ of error to the District Court under Section 238 of the Judicial Code. The plaintiffs in error, hereafter to be called the defendants, George Carroll and John Kiro, were indicted and convicted for transporting in an automobile intoxicating spirituous liquor, to wit: 68 quarts of so-called bonded whiskey and gin, in violation of the National Prohibition Act. The ground on which they assail the conviction is that the trial court admitted in evidence two of the 68 bottles, one of whiskey and one of gin, found by searching the automobile. It is contended that the search and seizure were in violation of the Fourth Amendment, and therefore that use of the liquor as evidence was not proper. Before the trial a motion was made by the defendants that all the liquor seized be returned to the defendant Carroll, who owned the automobile. This motion was denied.

The search and seizure were made by Cronenwett, Scully and Thayer, federal prohibition agents, and one Peterson, a state officer, in December, 1921, as the car was going westward on the highway between Detroit and Grand Rapids at a point 16 miles outside of Grand Rapids. The facts leading to the search and seizure were as follows: On September 29th, Cronenwett and Scully were in an apartment in Grand Rapids. Three men came to that apartment, a man named Kruska and the two de-

fendants, Carroll and Kiro. Cronenwett was introduced to them as one Stafford, working in the Michigan Chair Company in Grand Rapids, who wished to buy three cases of whiskey. The price was fixed at $130 a case. The three men said they had to go to the east end of Grand Rapids to get the liquor and that they would be back in half or three-quarters of an hour. They went away and in a short time Kruska came back and said they could not get it that night, that the man who had it was not in, but that they would deliver it the next day. They had come to the apartment in an automobile known as an Oldsmobile Roadster, the number of which Cronenwett then identified, as did Scully. The proposed vendors did not return the next day and the evidence disclosed no explanation of their failure to do so. One may surmise that it was suspicion of the real character of the proposed purchaser, whom Carroll subsequently called by his first name when arrested in December following. Cronenwett and his subordinates were engaged in patrolling the road leading from Detroit to Grand Rapids, looking for violations of the Prohibition Act. This seems to have been their regular tour of duty. On the 6th of October, Carroll and Kiro, going eastward from Grand Rapids in the same Oldsmobile Roadster, passed Cronenwett and Scully some distance out from Grand Rapids. Cronenwett called to Scully, who was taking lunch, that the Carroll boys had passed them going toward Detroit and sought with Scully to catch up with them to see where they were going. The officers followed as far as East Lansing, half way to Detroit, but there lost trace of them. On the 15th of December, some two months later, Scully and Cronenwett, on their regular tour of duty, with Peterson, the state officer, were going from Grand Rapids to Ionia, on the road to Detroit, when Kiro and Carroll met and passed them in the same automobile, coming from the direction of Detroit to Grand Rapids. The government agents turned

their car and followed the defendants to a point some sixteen miles east of Grand Rapids, where they stopped them and searched the car. They found behind the upholstering of the seats, the filling of which had been removed, 68 bottles. These had labels on them, part purporting to be certificates of English chemists that the contents were blended Scotch whiskeys, and the rest that the contents were Gordon gin made in London. When an expert witness was called to prove the contents, defendants admitted the nature of them to be whiskey and gin. When the defendants were arrested, Carroll said to Cronenwett, "Take the liquor and give us one more chance and I will make it right with you," and he pulled out a roll of bills, of which one was for $10. Peterson and another took the two defendants and the liquor and the car to Grand Rapids, while Cronenwett, Thayer and Scully remained on the road looking for other cars, of whose coming they had information. The officers were not anticipating that the defendants would be coming through on the highway at that particular time, but when they met them there they believed they were carrying liquor; and hence the search, seizure and arrest.

*Mr. Thomas E. Atkinson* and *Mr. Clare J. Hall,* for plaintiffs in error, submitted. *Mr. James N. Lombard* was also on the brief.[1]

There was nothing about the appearance of the car to indicate that it carried liquor. The liquor was only found after a thorough search and destruction of the cushion. Two of the officers testified that they had seen the car twice before, but there was no evidence that it had ever transported liquor before. The officers had never purchased liquor from plaintiffs in error although they testi-

---

[1] At the former hearing the case was argued by *Mr. Thomas E. Atkinson. Messrs. Clare J. Hall* and *James A. Lombard* were also on the brief.

fied that they had tried and had not been successful. They admit that they had no information that this car was coming through at this particular time and that they were merely patrolling the road.

When an arrest is made without a warrant, the burden is on the officers to show legality of the arrest. At common law a distinction was made between arrest without warrant in the case of felony and in the case of misdemeanor. While an officer might arrest one upon reasonable grounds of suspicion that he had committed a felony, he could not arrest for a misdemeanor unless the offence was committed in his presence. The true rule is that unless the offence is discoverable without a search, it is not, in legal contemplation, committed in the presence of the officer. From their own admission the officers had no reason to believe that the plaintiffs in error were committing a felony or a misdemeanor. The search must therefore have been based upon a mere capricious venture. No misdemeanor was committed in the officers' presence and hence they could not legally arrest without a warrant. *Kurtz* v. *Moffitt,* 115 U. S. 487; *John Bad Elk* v. *United States,* 177 U. S. 529; *Drennan* v. *People,* 10 Mich. 169; *Sarah Way's Case,* 41 Mich. 299; *State* v. *Lutz,* 85 W. Va. 330; *State* v. *Wills,* 91 W. Va. 659; *Snyder* v. *United States,* 285 Fed. 1; *Pickett* v. *State,* 99 Ga. 12; *Roberson* v. *State,* 43 Fla. 156, 52 L. R. A. 751.

Not only does a misdemeanor have to be committed in the presence of the officer, but in addition, it must be a breach of the peace. *State* v. *Lutz, supra.*

No federal statute sets forth the circumstances under which an officer may arrest without a warrant. Under § 28 of the National Prohibition Act, taken in conjunction with § 788 of the Rev. Stats., a prohibition agent would have the same authority to arrest without a warrant, as a state officer. This offence was committed in the State of Michigan, consequently we look to the law of that

State.   There appears to be no statute in Michigan upon the subject.  *Sarah Way's Case, supra.*   The offence here was not a felony.   Moreover there were no grounds for belief that a felony had been committed.   The facts show that neither of the elements necessary for an arrest without a warrant for a misdemeanor exists in the cause.

The search and seizure were in violation of the Constitution.   We do not question the well established principle recognized by way of dictum in *Weeks* v. *United States,* 232 U. S. 383, that an officer may search a person legally arrested to discover and seize the fruits or evidences of the crime.   But this principle has no application here for two reasons, viz., first, the search preceded the arrest and, second, the arrest, being illegal, gave no more right to search than if there had been no arrest at all.   *Pickett* v. *State, supra; Youman* v. *State,* 189 Ky. 152; *State* v. *Wills, supra; People* v. *Margelis,* 217 Mich. 423; *United States* v. *Myers,* 287 Fed. 260.

There are a few examples of visitorial power of officials to search.   They are exceptions and are reasonable only because of the peculiar circumstances under which they are permitted.   General executive or judicial warrants to search are void at common law, as seen by the *Wilkes Cases,* and are expressly forbidden by the Constitution.   General warrants of authority to search granted by the legislature would be even worse, because their nature would necessarily be more sweeping than executive or judicial warrants and hence more capable of abuse on the part of numerous petty officials.

In two instances officers are granted visitorial powers.   Customs officers are granted power by Congress to search persons and property for dutiable goods (Rev. Stats. § 3059).   This is a device necessary for the collection of customs and may be said to be a right which the Government exercises over individuals in exchange for the privi-

lege of entering the territory of the United States. Moreover, it is not readily capable of abuse, for the searches are ordinarily made only at points of entry and under the supervision of responsible superiors. It is true also that by § 3061 persons and vehicles may be searched by customs officers outside the customs house. This is for the obvious purpose of reaching dutiable goods which have escaped the payment of duty by evasion. No case has determined its constitutionality. It is extremely doubtful if evidence thus obtained by customs officers could be lawfully used in a criminal prosecution. Moreover, customs officers were limited in number. The power was never given to internal revenue officers, who had, however, a right to inspect distillers etc. without a warrant (Rev. Stats. § 3177). Federal prohibition agents were not granted the right of customs officers but of internal revenue officers only (41 Stat. 316). This indicates a clear legislative intent to deny to prohibition agents the right without a warrant to search persons and vehicles traveling on the highway.

Nor have prohibition agents the right to search all vehicles in order to discover violations under the provisions of § 26 of the National Prohibition Law, which says that when any officer " shall discover " a person in the act of transporting liquor, he shall seize the liquor and arrest the person in charge. *State* v. *One Hudson Automobile,* 190 N. Y. Supp. 481. Reaching the same conclusion is an article entitled: "A New Discovery," by George L. Hunt, 9 A. B. A. Journal, 321.

The history of the Fourth Amendment has been admirably set forth in *Boyd* v. *United States,* 116 U. S. 616. The Amendment mentions four things which are protected, viz, persons, houses, papers and effects. The decisions of this Court, however, have largely been confined to cases in which the houses of accused persons have been searched without a warrant and papers of an evi-

dential nature obtained as a result of the search. But the maxim that "a man's home is his castle" does not include the full scope of the Fourth Amendment. It likewise protects the persons, and effects, wherever they may be, against unreasonable searches and seizures. This is illustrated by the recent case of *Gouled* v. *United States*, 255 U. S. 298, in which this Court held that a seizure by stealth in an office, without a search warrant, was in violation of the Fourth Amendment. The Court attached no significance to the fact that papers, as distinguished from other property, were taken. Moreover, in the case of *Amos* v. *United States*, 255 U. S. 313, whisky seized by federal officers in a search of accused's home without a warrant, was held to be within the protection of the Fourth and Fifth Amendments. The state courts have held, in well-considered cases, that a search of personal property not contained in a house or building, without a search warrant, violates the section of the state Bill of Rights corresponding to the Fourth Amendment. *People* v. *Margelis*, 217 Mich. 423; *People* v. *Foreman*, 218 Mich. 591; *Blacksburg* v. *Beam*, 104 S. C. 146; *Tillman* v. *State*, 81 Fla. 558; *Pickett* v. *State*, 99 Ga. 12; *Hoyer* v. *State* (Wisc.), 193 N. W. 89; *Butler* v. *State*, 129 Miss. 778; *State* v. *Wills*, 91 W. Va. 659.

Well considered cases indicate that an officer has no right to search a vehicle traveling on the public highway. *Butler* v. *State, supra; Taylor* v. *State*, 129 Miss. 815; *State* v. *Pluth* (Minn.), 195 N. W. 789; *Hoyer* v. *State supra; State* v. *One Hudson Automobile, supra; State* v. *Gibbons*, 118 Wash. 171.

Citation of similar cases might be multiplied. The cases illustrate the principle that a seizure without a search warrant is unreasonable when an arrest would not be justified without a warrant. The proposition that the evidence which is found justifies the arrest or the seizure is a specious argument and has no support except in one

or two ill-considered district court cases. To use a homely phrase, it is an attempt to pull one's self up by his own bootstraps.

The mere fact that general searches of vehicles may help to enforce the Eighteenth Amendment does not make those searches reasonable.

Conceivably it might be permissible for an officer to search a vehicle before an arrest in cases where the arrest of the occupants might be justified without a knowledge of the facts learned through the search. This would be placing the cart before the horse, however, and we urge that this Court disapprove of such a practice. If the officer clearly knows facts sufficient to justify an arrest, he should make the arrest first and the search afterward.

If the principle of finding justifying the search be a valid one, it means simply that an officer may stop and search every vehicle or foot passenger on the highway and if liquor is discovered the search will be legal. Such practice would, in the words of Mr. Justice Bradley in *Boyd* v. *United States*, " suit the purpose of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom."

Not only this, but according to the argument, searches of homes without search warrants would be legalized in case liquor were found. This is exactly contrary to the *Amos Case* decided by this Court. *United States* v. *Slusser*, 270 Fed. 818.

If the words " shall discover " in § 26 of the Prohibition Law refer to a discovery by lawful means, the statute adds nothing to the common law power of the enforcing officers. If, on the other hand, it be so interpreted as to give the officers the right to search any and all vehicles passing on the highway, it is clearly in violation of the Fourth Amendment. If it be so construed, it is a general warrant a thousand times more sweeping than those issued against

Wilkes and his associates by Halifax. In the warrants issued by Lord Halifax, the parties were sometimes expressly mentioned by name and always designated as the publishers of certain matter. *Entick* v. *Carrington,* 19 How. St. Tr. 1029; *Leach* v. *Money,* 19 How. St. Tr. 1001; *Wilkes* v. *Wood,* 19 How. St. Tr. 1153.

The word " discover " may mean " finding out," " ascertaining " or " detecting." It is submitted that this is its natural meaning, and not to " examine," " explore," or some other mere action which may or may not result in disclosure. If the latter definition is accepted we have an act of Congress which is in effect a legislative general warrant addressed to all officers to search all vehicles.

Where property or evidence has been obtained through unconstitutional search and seizure, failure to return the same and to suppress the evidence learned thereby constitutes reversible error. *Boyd* v. *United States,* 116 U. S. 616; *Weeks* v. *United States,* 232 U. S. 383; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298: *Amos* v. *United States,* 255 U. S. 313.

In addition, the doctrine of the *Boyd* and *Weeks Cases* has found support in many well considered recent cases in the state courts under the provisions of the Bills of Rights in the state constitutions. The following cases in the Circuit Courts of Appeals hold that, in prosecutions for violation of the National Prohibition Act, evidence of liquor obtained by unlawful searches and seizures is inadmissible: *Snyder* v. *United States,* 285 Fed. 1; *Murphy* v. *United States,* 285 Fed. 801. The Circuit Court of Appeals for the second circuit has announced the same doctrine with reference to the possession of narcotics in violation of national law. *Ganci* v. *United States,* 287 Fed. 60.

The plaintiffs in error are entitled to a reversal of the conviction and return of the car and liquor seized.

*Mr. Solicitor General Beck,* with whom *Mr. Geo. Ross Hull,* Special Assistant to the Attorney General, was on the brief, for the United States.[2]

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

The constitutional and statutory provisions involved in this case include the Fourth Amendment and the National Prohibition Act.

The Fourth Amendment is in part as follows:

" The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person, or things to be seized."

Section 25, Title II, of the National Prohibition Act, c. 85, 41 Stat. 305, 315, passed to enforce the Eighteenth Amendment, makes it unlawful to have or possess any liquor intended for use in violating the Act, or which has been so used, and provides that no property rights shall exist in such liquor. A search warrant may issue and such liquor, with the containers thereof, may be seized under the warrant and be ultimately destroyed. The section further provides:

" No search warrant shall issue to search any private dwelling occupied as such unless it is being used for the unlawful sale of intoxicating liquor, or unless it is in part used for some business purpose such as a store, shop, saloon, restaurant, hotel, or boarding house. The term ' private dwelling ' shall be construed to include the room or rooms used and occupied not transiently but solely as

---

[2] At the former hearing the case was argued by *Mr. Assistant Attorney General Crim. Mr. Solicitor General Beck* and *Mr. Harry Susman* were also on the brief.

a residence in an apartment house, hotel, or boarding house."

Section 26, Title II, under which the seizure herein was made, provides in part as follows:

" When the commissioner, his assistants, inspectors, or any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof."

The section then provides that the court upon conviction of the person so arrested shall order the liquor destroyed, and except for good cause shown shall order a sale by public auction of the other property seized, and that the proceeds shall be paid into the Treasury of the United States.

By Section 6 of an Act supplemental to the National Prohibition Act, c. 134, 42 Stat. 222, 223, it is provided that if any officer or agent or employee of the United States engaged in the enforcement of the Prohibition Act or this Amendment, " shall search any private dwelling," as defined in that Act, " without a warrant directing such search," or " shall without a search warrant maliciously and without reasonable cause search any other building or property," he shall be guilty of a misdemeanor and subject to fine or imprisonment or both.

In the passage of the supplemental Act through the Senate, Amendment No. 32, known as the Stanley Amendment, was adopted, the relevant part of which was as follows:

" Section 6. That any officer, agent or employee of the United States engaged in the enforcement of this Act or

the National Prohibition Act, or any other law of the United States, who shall search or attempt to search the property or premises of any person without previously securing a search warrant, as provided by law, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not to exceed $1000, or imprisoned not to exceed one year, or both so fined and imprisoned in the discretion of the Court."

This Amendment was objected to in the House, and the Judiciary Committee, to whom it was referred, reported to the House of Representatives the following as a substitute.

" Sec. 6. That no officer, agent or employee of the United States, while engaged in the enforcement of this Act, the National Prohibition Act, or any law in reference to the manufacture or taxation of, or traffic in, intoxicating liquor, shall search any private dwelling without a warrant directing such search, and no such warrant shall issue unless there is reason to believe such dwelling is used as a place in which liquor is manufactured for sale or sold. The term ' private dwelling ' shall be construed to include the room or rooms occupied not transiently, but solely as a residence in an apartment house, hotel, or boarding house. Any violation of any provision of this paragraph shall be punished by a fine of not to exceed $1000 or imprisonment not to exceed one year, or both such fine and imprisonment, in the discretion of the court." . .

In its report the Committee spoke in part as follows:

" It appeared to the committee that the effect of the Senate amendment No. 32, if agreed to by the House, would greatly cripple the enforcement of the national prohibition act and would otherwise seriously interfere with the Government in the enforcement of many other laws, as its scope is not limited to the prohibition law

42684°—25——10

but applies equally to all laws where prompt action is necessary. There are on the statute books of the United States a number of laws authorizing search without a search warrant. Under the common law and agreeably to the Constitution search may in many cases be legally made without a warrant. The Constitution does not forbid search, as some parties contend, but it does forbid unreasonable search. This provision in regard to search is as a rule contained in the various State constitutions, but notwithstanding that fact search without a warrant is permitted in many cases, and especially is that true in the enforcement of liquor legislation.

" The Senate amendment prohibits all search or attempt to search any property or premises without a search warrant. The effect of that would necessarily be to prohibit all search, as no search can take place if it is not on some property or premises.

" Not only does this amendment prohibit search of any lands but it prohibits the search of all property. It will prevent the search of the common bootlegger and his stock in trade though caught and arrested in the act of violating the law. But what is perhaps more serious, it will make it impossible to stop the rum running automobiles engaged in like illegal traffic. It would take from the officers the power that they absolutely must have to be of any service, for if they can not search for liquor without a warrant they might as well be discharged. It is impossible to get a warrant to stop an automobile. Before a warrant could be secured the automobile would be beyond the reach of the officer with its load of illegal liquor disposed of."

The conference report resulted, so far as the difference between the two Houses was concerned, in providing for the punishment of any officer, agent or employee of the Government who searches a " private dwelling " without a warrant, and for the punishment of any such officer,

etc., who searches any "other building or property" where, and only where, he makes the search without a warrant "maliciously and without probable cause." In other words, it left the way open for searching an automobile, or vehicle of transportation, without a warrant, if the search was not malicious or without probable cause.

The intent of Congress to make a distinction between the necessity for a search warrant in the searching of private dwellings and in that of automobiles and other road vehicles is the enforcement of the Prohibition Act is thus clearly established by the legislative history of the Stanley Amendment. Is such a distinction consistent with the Fourth Amendment? We think that it is. The Fourth Amendment does not denounce all searches or seizures, but only such as are unreasonable.

The leading case on the subject of search and seizure is *Boyd* v. *United States,* 116 U. S. 616. An Act of Congress of June 22, 1874, authorized a court of the United States, in revenue cases, on motion of the government attorney, to require the defendant to produce in court his private books, invoices and papers on pain in case of refusal of having the allegations of the attorney in his motion taken as confessed. This was held to be unconstitutional and void as applied to suits for penalties or to establish a forfeiture of goods, on the ground that under the Fourth Amendment the compulsory production of invoices to furnish evidence for forfeiture of goods constituted an unreasonable search even where made upon a search warrant, and that it was also a violation of the Fifth Amendment, in that it compelled the defendant in a criminal case to produce evidence against himself or be in the attitude of confessing his guilt.

In *Weeks* v. *United States,* 232 U. S. 383, it was held that a court in a criminal prosecution could not retain letters of the accused seized in his house, in his absence and without his authority, by a United States marshal

holding no warrant for his arrest and none for the search
of his premises, to be used as evidence against him, the
accused having made timely application to the court for
an order for the return of the letters.

In *Silverthorne Lumber Company* v. *United States*, 251
U. S. 385, a writ of error was brought to reverse a judg-
ment of contempt of the District Court, fining the com-
pany and imprisoning one Silverthorne, its president,
until he should purge himself of contempt in not pro-
ducing books and documents of the company before the
grand jury to prove violation of the statutes of the United
States by the company and Silverthorne. Silverthorne
had been arrested and while under arrest the marshal had
gone to the office of the company without a warrant and
made a clean sweep of all books, papers and documents
found there and had taken copies and photographs of the
papers. The District Court ordered the return of the
originals, but impounded the photographs and copies.
This was held to be an unreasonable search of the prop-
erty and possessions of the corporation and a violation of
the Fourth Amendment and the judgment for contempt
was reversed.

In *Gouled* v. *United States*, 255 U. S. 298, the obtaining
through stealth by a representative of the Government,
from the office of one suspected of defrauding the Gov-
ernment, of a paper which had no pecuniary value in itself
but was only to be used as evidence against its owner, was
held to be a violation of the Fourth Amendment. It was
further held that when the paper was offered in evidence
and duly objected to it must be ruled inadmissible because
obtained through an unreasonable search and seizure, and
also in violation of the Fifth Amendment because working
compulsory incrimination.

In *Amos* v. *United States*, 255 U. S. 313, it was held
that where concealed liquor was found by government
officers without a search warrant in the home of the de-

fendant, in his absence, and after a demand made upon his wife, it was inadmissible as evidence against the defendant, because acquired by an unreasonable seizure.

In none of the cases cited is there any ruling as to the validity under the Fourth Amendment of a seizure without a warrant of contraband goods in the course of transportation and subject to forfeiture or destruction.

On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.

In *Boyd v. United States,* 116 U. S. 616, as already said, the decision did not turn on whether a reasonable search might be made without a warrant; but for the purpose of showing the principle on which the Fourth Amendment proceeds, and to avoid any misapprehension of what was decided, the Court, speaking through Mr. Justice Bradley, used language which is of particular significance and applicability here. It was there said (page 623):

" The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo.* In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the

common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect. As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as ' unreasonable,' and they are not embraced within the prohibition of the amendment. So, also, the supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection, are necessarily excepted out of the category of unreasonable searches and seizures. So, also, the laws which provide for the search and seizure of articles and things which it is unlawful for a person to have in his possession for the purpose of issue or disposition, such as counterfeit coin, lottery tickets, implements of gambling, &c., are not within this category. *Commonwealth* v. *Dana*, 2 Met. (Mass.) 329. Many other things of this character might be enumerated."

It is noteworthy that the twenty-fourth section of the Act of 1789 to which the Court there refers provides:

" That every collector, naval officer and surveyor, or other person specially appointed by either of them for that purpose, shall have full power and authority, to enter any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed; and therein to search for, seize, and secure any such goods, wares or merchandise; and if they shall have cause to suspect a concealment thereof, in any

particular dwelling-house, store, building, or other place, they or either of them shall, upon application on oath or affirmation to any justice of the peace, be entitled to a warrant to enter such house, store, or other place (in the day time only) and there to search for such goods, and if any shall be found, to seize and secure the same for trial; and all such goods, wares, and merchandise, on which the duties shall not have been paid or secured, shall be forfeited."

Like provisions were contained in the Act of August 4, 1790, c. 35, Sections 48–51, 1 Stat. 145, 170; in Section 27 of the Act of February 18, 1793, c. 8, 1 Stat. 305, 315, and in Sections 68–71 of the Act of March 2, 1799, c. 22, 1 Stat. 627, 677, 678.

Thus contemporaneously with the adoption of the Fourth Amendment we find in the first Congress, and in the following Second and Fourth Congresses, a difference made as to the necessity for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of reach of a search warrant. Compare *Hester* v. *United States*, 265 U. S. 57.

Again, by the second section of the Act of March 3, 1815, 3 Stat. 231, 232, it was made lawful for customs officers not only to board and search vessels within their own and adjoining districts, but also to stop, search and examine any vehicle, beast or person on which or whom they should suspect there was merchandise which was subject to duty or had been introduced into the United States in any manner contrary to law, whether by the person in charge of the vehicle or beast or otherwise, and if they should find any goods, wares or merchandise thereon, which they had probable cause to believe had been so unlawfully brought into the country, to seize and secure the same, and the vehicle or beast as well, for trial

and forfeiture. This Act was renewed April 27, 1816, 3 Stat. 315, for a year and expired. The Act of February 28, 1865, revived Section 2 of the Act of 1815, above described, c. 67, 13 Stat. 441. The substance of this section was reënacted in the third section of the Act of July 18, 1866, c. 201, 14 Stat. 178, and was thereafter embodied in the Revised Statutes as Section 3061. Neither Section 3061 nor any of its earlier counterparts has ever been attacked as unconstitutional. Indeed that section was referred to and treated as operative by this Court in *Cotzhausen* v. *Nazro,* 107 U. S. 215, 219. See also *United States* v. *One Black Horse,* 129 Fed. 167.

Again by Section 2140 of the Revised Statutes any Indian agent, sub-agent or commander of a military post in the Indian Country, having reason to suspect or being informed that any white person or Indian is about to introduce, or has introduced, any spirituous liquor or wine into the Indian Country, in violation of law, may cause the boats, stores, packages, wagons, sleds and places of deposit of such person to be searched, and if any liquor is found therein, then it, together with the vehicles, shall be seized and proceeded against by libel in the proper court and forfeited. Section 2140 was the outgrowth of the Act of May 6, 1822, c. 58, 3 Stat. 682, authorizing Indian agents to cause the goods of traders in the Indian Country to be searched upon suspicion or information that ardent spirits were being introduced into the Indian Country, to be seized and forfeited if found; and of the Act of June 30, 1834, Section 20, c. 161, 4 Stat. 729, 732, enabling an Indian agent having reason to suspect any person of having introduced or being about to introduce liquors into the Indian Country to cause the boats, stores or places of deposit of such person to be searched and the liquor found forfeited. This Court recognized the statute of 1822 as justifying such a search and seizure in *American Fur Co.* v. *United States,* 2 Pet. 358. By the Indian

Appropriation Act of March 2, 1917, c. 146, 39 Stat. 969, 970, automobiles used in introducing or attempting to introduce intoxicants into the Indian Territory may be seized, libeled and forfeited as provided in the Revised Statutes, Section 2140.

And again, in Alaska, by Section 174 of the Act of March 3, 1899, c. 429, 30 Stat. 1253, 1280, it is provided that collectors and deputy collectors, or any person authorized by them in writing, shall be given power to arrest persons and seize vessels and merchandise in Alaska liable to fine, penalties or forfeiture under the Act and to keep and deliver the same; and the Attorney General, in construing the Act, advised the Government: " If your agents reasonably suspect that a violation of law has occurred, in my opinion they have power to search any vessel within the 3-mile limit according to the practice of customs officers when acting under Section 3059 of the Revised Statutes, and to seize such vessels." 26 Opinions Attorneys General 243.

We have made a somewhat extended reference to these statutes to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made. It would be intolerable and unreasonable

if a prohibition agent were authorized to stop every auto-
mobile on the chance of finding liquor and thus subject
all persons lawfully using the highways to the incon-
venience and indignity of such a search. Travellers may
be so stopped in crossing an international boundary be-
cause of national self protection reasonably requiring one
entering the country to identify himself as entitled to
come in, and his belongings as effects which may be law-
fully brought in. But those lawfully within the country,
entitled to use the public highways, have a right to free
passage without interruption or search unless there is
known to a competent official authorized to search, prob-
able cause for believing that their vehicles are carrying
contraband or illegal merchandise. Section 26, Title II,
of the National Prohibition Act, like the second section
of the Act of 1789, for the searching of vessels, like the
provisions of the Act of 1815, and Section 3061, Revised
Statutes, for searching vehicles for smuggled goods, and
like the Act of 1822, and that of 1834 and Section 2140,
R. S., and the Act of 1917 for the search of vehicles and
automobiles for liquor smuggled into the Indian Country,
was enacted primarily to accomplish the seizure and de-
struction of contraband goods; secondly, the automobile
was to be forfeited; and thirdly, the driver was to be
arrested. Under Section 29, Title II, of the Act the latter
might be punished by not more than $500 fine for the
first offense, not more than $1,000 fine or 90 days' im-
prisonment for the second offense, and by a fine of $500
or more and by not more than 2 years' imprisonment for
the third offense. Thus he is to be arrested for a misde-
meanor for his first and second offenses and for a felony
if he offends the third time. The main purpose of the
Act obviously was to deal with the liquor and its trans-
portation and to destroy it. The mere manufacture of
liquor can do little to defeat the policy of the Eighteenth
Amendment and the Prohibition Act, unless the for-

bidden product can be distributed for illegal sale and use. Section 26 was intended to reach and destroy the forbidden liquor in transportation and the provisions for forfeiture of the vehicle and the arrest of the transporter were incidental. The rule for determining what may be required before a seizure may be made by a competent seizing official is not to be determined by the character of the penalty to which the transporter may be subjected. Under Section 28, Title II, of the Prohibition Act the Commissioner of Internal Revenue, his assistants, agents and inspectors are to have the power and protection in the enforcement of the Act conferred by the existing laws relating to the manufacture or sale of intoxicating liquors. Officers who seize under Section 26 of the Prohibition Act are therefore protected by Section 970 of the Revised Statutes, providing that:

"When, in any prosecution commenced on account of the seizure of any vessel, goods, wares, or merchandise, made by any collector or other officer, under any Act of Congress authorizing such seizure, judgment is rendered for the claimant, but it appears to the court that there was reasonable cause of seizure, the court shall cause a proper certificate thereof to be entered, and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution: *Provided,* That the vessel, goods, wares, or merchandise be, after judgment, forthwith returned to such claimant or his agent."

It follows from this that if an officer seizes an automobile or the liquor in it without a warrant and the facts as subsequently developed do not justify a judgment of condemnation and forfeiture, the officer may escape costs or a suit for damages by a showing that he had reasonable or probable cause for the seizure. *Stacey v. Emery,* 97 U. S. 642. The measure of legality of such a seizure is,

therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported.

We here find the line of distinction between legal and illegal seizures of liquor in transport in vehicles. It is certainly a reasonable distinction. It gives the owner of an automobile or other vehicle seized under Section 26, in absence of probable cause, a right to have restored to him the automobile, it protects him under the *Weeks* and *Amos* cases from use of the liquor as evidence against him, and it subjects the officer making the seizures to damages. On the other hand, in a case showing probable cause, the Government and its officials are given the opportunity which they should have, to make the investigation necessary to trace reasonably suspected contraband goods and to seize them.

Such a rule fulfills the guaranty of the Fourth Amendment. In cases where the securing of a warrant is reasonably practicable, it must be used, and when properly supported by affidavit and issued after judicial approval protects the seizing officer against a suit for damages. In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause. *United States* v. *Kaplan,* 286 Fed. 963, 972.

But we are pressed with the argument that if the search of the automobile discloses the presence of liquor and leads under the statute to the arrest of the person in charge of the automobile, the right of seizure should be limited by the common law rule as to the circumstances justifying an arrest without warrant for a misdemeanor. The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed

in his presence.  *Kurtz* v. *Moffitt,* 115 U. S. 487; *Elk* v.
*United States,* 177 U. S. 529.  The rule is sometimes expressed as follows:

". "In cases of misdemeanor, a peace officer like a private
person has at common law no power of arresting without
a warrant except when a breach of the peace has been
committed in his presence or there is reasonable ground
for supposing that a breach of peace is about to be committed or renewed in his presence."  Halsbury's Laws of
England, Vol. 9, part III, 612. .

The reason for arrest for misdemeanors without warrant
at common law was promptly to suppress breaches of the
peace, 1 Stephen, History of Criminal Law, 193, while the
reason for arrest without warrant on a reliable report of
a felony was because the public safety and the due apprehension of criminals charged with heinous offenses required that such arrests should be made at once without
warrant.  *Rohan* v. *Sawin,* 5 Cush. 281.  The argument
for defendants is that as the misdemeanor to justify arrest
without warrant must be committed in the presence of the
police officer, the offense is not committed in his presence
unless he can by his senses detect that the liquor is being
transported, no matter how reliable his previous information by which he can identify the automobile as loaded
with it.  *Elrod* v. *Moss,* 278 Fed. 123; *Hughes* v. *State,*
145 Tenn. 544.

So it is that under the rule contended for by defendants
the liquor if carried by one who has been already twice
convicted of the same offense may be seized on information other than the senses, while if he has been only once
convicted it may not be seized unless the presence of the
liquor is detected by the senses as the automobile concealing it rushes by.  This is certainly a very unsatisfactory line of difference when the main object of the
section is to forfeit and suppress the liquor, the arrest of
the individual being only incidental as shown by the light-

ness of the penalty. See *Commonwealth* v. *Street*, 3 Pa. Dist. & Co. Reports, 783. In England at the common law the difference in punishment between felonies and misdemeanors was very great. Under our present federal statutes, it is much less important and Congress may exercise a relatively wide discretion in classing particular offenses as felonies or misdemeanors. As the main purpose of Section 26 was seizure and forfeiture, it is not so much the owner as the property that offends. *Agnew* v. *Haymes*, 141 Fed. 631; 641. The language of the section provides for seizure when the officer of the law " discovers." any one in the act of transporting the liquor by automobile or other vehicle. Certainly it is a very narrow and technical construction of this word which would limit it to what the officer sees, hears or smells as the automobile rolls by and exclude therefrom, when he identifies the car, the convincing information that he may previously have received as to the use being made of it.

We do not think such a nice distinction is applicable in the present case. When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution. *Weeks* v. *United States*, 232 U. S. 383, 392; *Dillon* v. *O'Brien and Davis*, 16 Cox. C. C. 245; *Getchell* v. *Page*, 103 Me. 387; *Kneeland* v. *Connally*, 70 Ga. 424; 1 Bishop, Criminal Procedure, Sec. 211; 1 Wharton, Criminal Procedure (10th edition), Sec. 97. The argument of defendants is based on the theory that the seizure in this case can only be thus justified. If their theory were sound, their conclusion would be. The validity of the seizure then would turn wholly on the validity of the arrest without a seizure. But the theory is unsound. The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer

has for belief that the contents of the automobile offend against the law. The seizure in such a proceeding comes before the arrest as Section 26 indicates. It is true that Section 26, Title II, provides for immediate proceedings against the person arrested and that upon conviction the liquor is to be destroyed and the automobile or other vehicle is to be sold, with the saving of the interest of a lienor who does not know of its unlawful use; but it is evident that if the person arrested is ignorant of the contents of the vehicle, or if he escapes, proceedings can be had against the liquor for destruction or other disposition under Section 25 of the same title. The character of the offense for which, after the contraband liquor is found and seized, the driver can be prosecuted does not affect the validity of the seizure.

This conclusion is in keeping with the requirements of the Fourth Amendment and the principles of search and seizure of contraband forfeitable property; and it is a wise one because it leaves the rule one which is easily applied and understood and is uniform. *Houck* v. *State,* 106 Ohio St. 195, accords with this conclusion. *Ash* v. *United States,* 299 Fed. 277 and *Milam* v. *United States,* 296 Fed. 629, decisions by the Circuit Court of Appeals for the fourth circuit, take the same view. The *Ash* case is very similar in its facts to the case at bar and both were by the same court which decided *Snyder* v. *United States,* 285 Fed. 1, cited for the defendants. See also *Park* v. *United States* (1st C. C. A.) 294 Fed. 776, 783, and *Lambert* v. *United States,* (9th C. C. A.) 282 Fed. 413.

Finally, was there probable cause? In *The Apollon,* 9 Wheat. 362, the question was whether the seizure of a French vessel at a particular place was upon probable cause that she was there for the purpose of smuggling. In this discussion Mr. Justice Story, who delivered the judgment of the Court, said (page 374):

"It has been very justly observed at the bar, that the Court is bound to take notice of public facts and geo-

graphical positions; and that this remote part of the country has been infested, at different periods, by smugglers, is a matter of general notoriety, and may be gathered from the public documents of the government."

We know in this way that Grand Rapids is about 152 miles from Detroit and that Detroit and its neighborhood along the Detroit River, which is the International Boundary, is one of the most active centers for introducing illegally into this country spirituous liquors for distribution into the interior. It is obvious from the evidence that the prohibition agents were engaged in a regular patrol along the important highways from Detroit to Grand Rapids to stop and seize liquor carried in automobiles. They knew or had convincing evidence to make them believe that the Carroll boys, as they called them, were so-called "bootleggers" in Grand Rapids, i. e., that they were engaged in plying the unlawful trade of selling such liquor in that city. The officers had soon after noted their going from Grand Rapids half way to Detroit and attempted to follow them to that city to see where they went, but they escaped observation. Two months later these officers suddenly met the same men on their way westward presumably from Detroit. The partners in the original combination to sell liquor in Grand Rapids were together in the same automobile they had been in the night when they tried to furnish the whisky to the officers which was thus identified as part of the firm equipment. They were coming from the direction of the great source of supply for their stock to Grand Rapids where they plied their trade. That the officers when they saw the defendants believed that they were carrying liquor we can have no doubt, and we think it is equally clear that they had reasonable cause for thinking so. Emphasis is put by defendants' counsel on the statement made by one of the officers that they were not looking for defendants at the particular time when they appeared. We do not perceive that it has any weight. As soon as they did appear,

the officers were entitled to use their reasoning faculties upon all the facts of which they had previous knowledge in respect to the defendants.

The necessity for probable cause in justifying seizures on land or sea, in making arrests without warrant for past felonies, and in malicious prosecution and false imprisonment cases has led to frequent definition of the phrase. In *Stacey* v. *Emery,* 97 U. S. 642, 645, a suit for damages for seizure by a collector, this Court defined probable cause as follows:

" If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient." *Locke* v. *United States,* 7 Cranch, 339; *The George,* 1 Mason, 24; *The Thompson,* 3 Wall. 155. It was laid down by Chief Justice Shaw, in *Commonwealth* v. *Carey,* 12 Cush. 246, 251 that " if a constable or other peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts, or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful." *Commonwealth* v. *Phelps,* 209 Mass. 396; *Rohan* v. *Sawin,* 5 Cush. 281, 285. In *McCarthy* v. *De Armit,* 99 Pa. St. 63, the Supreme Court of Pennsylvania sums up the definition of probable cause in this way (page 69):

" The substance of all the definitions is a reasonable ground for belief in guilt."

In the case of the *Director General* v. *Kastenbaum,* 263 U. S. 25, which was a suit for false imprisonment, it was said by this Court (page 28):

" But, as we have seen, good faith is not enough to constitute probable cause. That faith must be grounded on facts within knowledge of the Director General's agent,

42684°—25——11

which in the judgment of the court would make his faith reasonable." See also *Munn* v. *De Nemours,* 3 Wash. C. C. 37.

In the light of these authorities, and what is shown by this record, it is clear the officers here had justification for the search and seizure. This is to say that the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched.

Counsel finally argue that the defendants should be permitted to escape the effect of the conviction because the court refused on motion to deliver them the liquor when, as they say, the evidence adduced on the motion was much less than that shown on the trial, and did not show probable cause. The record does not make it clear what evidence was produced in support of or against the motion. But, apart from this, we think the point is without substance here. If the evidence given on the trial was sufficient, as we think it was, to sustain the introduction of the liquor as evidence, it is immaterial that there was an inadequacy of evidence when application was made for its return. A conviction on adequate and admissible evidence should not be set aside on such a ground. The whole matter was gone into at the trial, so no right of the defendants was infringed.

Counsel for the Government contend that Kiro, the defendant who did not own the automobile, could not complain of the violation of the Fourth Amendment in the use of the liquor as evidence against him, whatever the view taken as to Carroll's rights. Our conclusion as to the whole case makes it unnecessary for us to discuss this aspect of it.

The judgment is

*Affirmed.*

Mr. Justice McKenna, before his retirement, concurred in this opinion.

The separate opinion of Mr. Justice McReynolds concurred in by Mr. Justice Sutherland.

1. The damnable character of the "bootlegger's" business should not close our eyes to the mischief which will surely follow any attempt to destroy it by unwarranted methods. "To press forward to a great principle by breaking through every other great principle that stands in the way of its establishment; . . . in short, to procure an eminent good by means that are unlawful, is as little consonant to private morality as to public justice." Sir William Scott, The Louis, 2 Dodson 210, 257.

While quietly driving an ordinary automobile along a much frequented public road, plaintiffs in error were arrested by Federal officers without a warrant and upon mere suspicion—ill founded, as I think. The officers then searched the machine and discovered carefully secreted whisky, which was seized and thereafter used as evidence against plaintiffs in error when on trial for transporting intoxicating liquor contrary to the Volstead Act (c. 85, 41 Stat. 305). They maintain that both arrest and seizure were unlawful and that use of the liquor as evidence violated their constitutional rights.

This is not a proceeding to forfeit seized goods; nor is it an action against the seizing officer for a tort. Cases like the following are not controlling: Crowell v. M'Fadon, 8 Cranch 94, 98; United States v. 1960 Bags of Coffee, 8 Cranch 398, 403, 405; Otis v. Watkins, 9 Cranch 339; Gelston v. Hoyt, 3 Wheat. 246, 310, 318; Wood v. United States, 16 Pet. 342; Taylor v. United States, 3 How. 197, 205. They turned upon express provisions of applicable Acts of Congress; they did not involve the point now presented and afford little, if any, assistance toward its proper solution. The Volstead Act does not, in terms, authorize arrest or seizure upon mere suspicion.

Whether the officers are shielded from prosecution or action by Rev. Stat. Sec. 970 is not important. That section does not undertake to deprive the citizen of any constitutional right or to permit the use of evidence unlawfully obtained. It does, however, indicate the clear understanding of Congress that probable cause is not always enough to justify a seizure.

Nor are we now concerned with the question whether by apt words Congress might have authorized the arrest without a warrant. It has not attempted to do this. On the contrary, the whole history of the legislation indicates a fixed purpose not so to do. First and second violations are declared to be misdemeanors—nothing more—and Congress, of course, understood the rule concerning arrests for such offenses. Whether different penalties should have been prescribed or other provisions added is not for us to inquire; nor do difficulties attending enforcement give us power to supplement the legislation.

2. As the Volstead Act contains no definite grant of authority to arrest upon suspicion and without warrant for a first offense, we come to inquire whether such authority can be inferred from its provisions.

Unless the statute which creates a misdemeanor contains some clear provision to the contrary, suspicion that it is being violated will not justify an arrest. Criminal statutes must be strictly construed and applied, in harmony with rules of the common law. *United States* v. *Harris*, 177 U. S. 305, 310. And the well settled doctrine is that an arrest for a misdemeanor may not be made without a warrant unless the offense is committed in the officer's presence.

*Kurtz* v. *Moffitt*, 115 U. S. 487, 498—" By the common law of England, neither a civil officer nor a private citizen had the right without a warrant to make an arrest for a crime not committed in his presence except in the case

of felony, and then only for the purpose of bringing the offender before a civil magistrate."

*Elk* v. *United States,* 177 U. S. 529, 534—"An officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence."

*Commonwealth* v. *Wright,* 158 Mass. 149, 158—" It is suggested that the statutory misdemeanor of having in one's possession short lobsters with intent to sell them is a continuing offence, which is being committed while such possession continues, and that therefore an officer who sees any person in possesssion of such lobsters with intent to sell them can arrest such person without a warrant, as for a misdemeanor committed in his presence. We are of opinion, however, that for statutory misdemeanors of this kind, not amounting to a breach of the peace, there is no authority in an officer to arrest without a warrant, unless it is given by statute. . . . The Legislature has often empowered officers to arrest without warrant for similar offenses, which perhaps tends to show that, in its opinion, no such right exists at common law."

*Pinkerton* v. *Verberg,* 78 Mich. 573, 584—" Any law which would place the keeping and safe conduct of another in the hands of even a conservator of the peace, unless for some breach of the peace committed in his presence, or upon suspicion of felony, would be most oppressive and unjust, and destroy all the rights which our Constitution guarantees. These are rights which existed long before our Constitution, and we have taken just pride in their maintenance, making them a part of the fundamental law of the land. . . . If persons can be restrained of their liberty, and assaulted and imprisoned, under such circumstances, without complaint or warrant, then there is no limit to the power of a police officer."

3. The Volstead Act contains no provision which annuls the accepted common law rule or discloses definite intent

to authorize arrests without warrant for misdemeanors not committed in the officer's presence.

To support the contrary view Section 26 is relied upon—

"When . . . any officer of the law shall discover any person in the act of transporting in violation of the law, intoxicating liquors in any wagon, buggy, automobile, water or air craft, or other vehicle, it shall be his duty to seize any and all intoxicating liquors found therein being transported contrary to law. Whenever intoxicating liquors transported or possessed illegally shall be seized by an officer he shall take possession of the vehicle and team or automobile, boat, air or water craft, or any other conveyance, and shall arrest any person in charge thereof."

Let it be observed that this section has no special application to automobiles; it includes *any* vehicle—buggy, wagon, boat or air craft. Certainly, in a criminal statute, always to be strictly construed, the words "shall discover . . . in the act of transporting in violation of the law" cannot mean, shall have reasonable cause to suspect or believe that such transportation is being carried on. To discover and to suspect are wholly different things. Since the beginning apt words have been used when Congress intended that arrests for misdemeanors or seizures might be made upon suspicion. It has studiously refrained from making a felony of the offense here charged; and it did not undertake by any apt words to enlarge the power to arrest. It was not ignorant of the established rule on the subject, and well understood how this could be abrogated, as plainly appears from statutes like the following: "An Act to regulate the collection of duties on imports and tonnage," approved March 2, 1789, c. 22, 1 Stat. 627, 677, 678; "An Act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise im-

ported into the United States, and on the tonnage of ships or vessels," approved August 4, 1790, c. 35, 1 Stat. 145, 170; "An Act further to provide for the collection of duties on imports and tonnage," approved March 3, 1815, c. 94, 3 Stat. 231, 232. These and similar Acts definitely empowered officers to seize upon suspicion and therein radically differ from the Volstead Act, which authorized no such thing.

"An Act supplemental to the National Prohibition Act," approved November 23, 1921, c. 134, 42 Stat. 222, 223, provides—

"That any officer, agent, or employee of the United States engaged in the enforcement of this Act, or the National Prohibition Act, or any other law of the United States, who shall search any private dwelling as defined in the National Prohibition Act, and occupied as such dwelling, without a warrant directing such search, or who while so engaged shall without a search warrant maliciously and without reasonable cause search any other building or property, shall be guilty of a misdemeanor and upon conviction thereof shall be fined for a first offense not more than $1,000, and for a subsequent offense not more than $1,000 or imprisoned not more than one year, or both such fine and imprisonment."

And it is argued that the words and history of this section indicate the intent of Congress to distinguish between the necessity for warrants in order to search private dwellings and the right to search automobiles without one. Evidently Congress regarded the searching of private dwellings as matter of much graver consequence than some other searches and distinguished between them by declaring the former criminal. But the connection between this distinction and the legality of plaintiffs in error's arrest is not apparent. Nor can I find reason for inquiring concerning the validity of the distinction under the Fourth Amendment. Of course, the distinction is

valid, and so are some seizures. But what of it? The Act made nothing legal which theretofore was unlawful, and to conclude that by declaring the unauthorized search of a private dwelling criminal Congress intended to remove ancient restrictions from other searches and from arrests as well, would seem impossible.

While the Fourth Amendment denounces only unreasonable seizures, unreasonableness often depends upon the means adopted. Here the seizure followed an unlawful arrest, and therefore became itself unlawful—as plainly unlawful as the seizure within the home so vigorously denounced in *Weeks* v. *United States*, 232 U. S. 383, 391, 392, 393.

In *Snyder* v. *United States*, 285 Fed. 1, 2, the Court of Appeals, Fourth Circuit, rejected evidence obtained by an unwarranted arrest, and clearly announced some very wholesome doctrine: " That an officer may not make an arrest for a misdemeanor not committed in his presence, without a warrant, has been so frequently decided as not to require citation of authority. It is equally fundamental that a citizen may not be arrested on suspicion of having committed a misdemeanor and have his person searched by force, without a warrant of arrest. If, therefore, the arresting officer in this case had no other justification for the arrest than the mere suspicion that a bottle, only the neck of which he could see protruding from the pocket of defendant's coat, contained intoxicating liquor, then it would seem to follow without much question that the arrest and search, without first having secured a warrant, were illegal. And that his only justification was his suspicion is admitted by the evidence of the arresting officer himself. If the bottle had been empty or if it had contained any one of a dozen innoxious liquids, the act of the officer would, admittedly, have been an unlawful invasion of the personal liberty of the defendant. That it happened in this instance to contain whisky, we think,

neither justifies the assault nor condemns the principle which makes such an act unlawful."

The validity of the seizure under consideration depends on the legality of the arrest. This did not follow the seizure, but the reverse is true. Plaintiffs in error were first brought within the officers' power, and, while therein, the seizure took place. If an officer, upon mere suspicion of a misdemeanor, may stop one on the public highway, take articles away from him and thereafter use them as evidence to convict him of crime, what becomes of the Fourth and Fifth Amendments?

In *Weeks* v. *United States, supra,* through Mr. Justice Day, this court said: " The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures and enforced confessions, the latter often obtained after subjecting accused persons to unwarranted practices destructive of rights secured by the Federal Constitution, should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights. . . . The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have

resulted in their embodiment in the fundamental law of the land."

*Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 391: " The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of. its pursuit by doing the forbidden act. *Weeks* v. *United States,* 232 U. S. 383, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U. S. 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."

*Gouled* v. *United States,* 255 U. S. 298, and *Amos* v. *United States,* 255 U. S. 313, distinctly point out that property procured by unlawful action of Federal officers cannot be introduced as evidence.

The arrest of plaintiffs in error was unauthorized, illegal and violated the guarantee of due process given by the Fifth Amendment. The liquor offered in evidence was obtained by the search which followed this arrest and was therefore obtained in violation of their constitutional

rights. Articles found upon or in the control of one lawfully arrested may be used as evidence for certain purposes, but not at all when secured by the unlawful action of a Federal officer.

4. The facts known by the officers who arrested plaintiffs in error were wholly insufficient to create a reasonable belief that they were transporting liquor contrary to law. These facts were detailed by Fred Cronenwelt, chief prohibition officer. His entire testimony as given at the trial follows—

" I am in charge of the Federal Prohibition Department in this District. I am acquainted with these two respondents, and first saw them on September 29, 1921, in Mr. Scully's apartment on Oakes Street, Grand Rapids. There were three of them that came to Mr. Scully's apartment, one by the name of Kruska, George Kiro and John Carroll. I was introduced to them under the name of Stafford, and told them I was working for the Michigan Chair Company, and wanted to buy three cases of whisky, and the price was agreed upon. After they thought I was all right, they said they would be back in half or three-quarters of an hour; that they had to go out to the east end of Grand Rapids, to get this liquor. They went away and came back in a short time, and Mr. Kruska came upstairs and said they couldn't get it that night; that a fellow by the name of Irving, where they were going to get it, wasn't in, but they were going to deliver it the next day, about ten. They didn't deliver it the next day. I am not positive about the price. It seems to me it was around $130 a case. It might be $135. Both respondents took part in this conversation. When they came to Mr. Scully's apartment they had this same car. While it was dark and I wasn't able to get a good look at this car, later, on the sixth day of October, when I was out on the road with Mr. Scully, I was waiting on the highway while he went to Reed's Lake to get a light

lunch, and they drove by, and I had their license number and the appearance of their car, and knowing the two boys, seeing them on the 29th day of September, I was satisfied when I seen the car on December 15th it was the same car I had seen on the 6th day of October. On the 6th day of October it was probably twenty minutes before Scully got back to where I was. I told him the Carroll boys had just gone toward Detroit and we were trying to catch up with them and see where they were going. We did catch up with them somewhere along by Ada, just before we got to Ada, and followed them to East Lansing. We gave up the chase at East Lansing.

" On the 15th of December, when Peterson and Scully and I overhauled this car on the road, it was in the country, on Pike 16, the road leading between Grand Rapids and Detroit. When we passed the car we were going toward Ionia, or Detroit, and the Kiro and Carroll boys were coming towards Grand Rapids when Mr. Scully and I recognized them and said ' there goes the Carroll brothers,' and we went on still further in the same direction we were going and turned around and went back to them; drove up to the side of them. Mr. Scully was driving the car; I was sitting in the front seat, and I stepped out on the running board and held out my hand and said, ' Carroll, stop that car,' and they did stop it. John Kiro was driving the car. After we got them stopped, we asked them to get out of the car, which they did. Carroll referred to me and called me by the name of ' Fred ' just as soon as I got up to him. Raised up the back part of the roadster; didn't find any liquor there; then raised up the cushion; then I struck at the lazyback of the seat and it was hard. I then started to open it up, and I did tear the cushion some, and Carroll said, ' Don't tear the cushion; we have only got six cases in there; ' and I took out two bottles and found out it was liquor; satisfied it was liquor. Mr. Peterson and a fellow by the

name of Gerald Donker came in with the two Carroll boys and the liquor and the car to Grand Rapids. They brought the two defendants and the car and the liquor to Grand Rapids. I and the other men besides Peterson stayed out on the road, looking for other cars that we had information were coming in. There was conversation between me and Carroll before Peterson started for town with the defendants. Mr. Carroll said, ' Take the liquor and give us one more chance and I will make it right with you.' At the same time he reached in one of his trousers pockets and pulled out money; the amount of it I don't know. I wouldn't say it was a whole lot. I saw a ten dollar bill and there was some other bills; I don't know how much there was; it wasn't a large amount.

"As I understand, Mr. Hanley helped carry the liquor from the car. On the next day afterwards, we put this liquor in boxes, steel boxes, and left it in the Marshal's vault, and it is still there now. Mr. Hanley and Chief Deputy Johnson, some of the agents and myself were there. Mr. Peterson was there the next day that the labels were signed by the different officers; those two bottles, Exhibits 'A' and ' B.'

" Q. Now, those two bottles, Exhibits 'A' and ' B,' were those the two bottles you took out of the car out there, or were those two bottles taken out of the liquor after it go up here?

"A. We didn't label them out on the road; simply found it was liquor and sent it in; and this liquor was in Mr. Hanley's custody that evening and during the middle of the next day when we checked it over to see the amount of liquor that was there. Mr. Johnson and I sealed the bottles and Mr. Johnson's name is on the label that goes over the box with mine, and this liquor was taken out of the case today. It was taken out for the purpose of analyzation. The others were not broken until today.

· " Q.` And are you able to tell us, from the label and from the bottles, whether it is part of the same liquor taken out of that car? A.· It has the appearance of it, yes sir. . Those are the bottles that were in there that Mr. Hanley said was gotten out of the Carroll car.

" [Cross-examination.] I think I was the first one to get back to the Carroll car after it was stopped. I had a gun in my pocket; I didn't present it. I was the first one to the car and raised up the back of the car, but the others were there shortly afterward. We assembled right around the car immediately.

" Q. And whatever examination and what investigation you made you went right ahead and did it in your own way? A. Yes, sir.

" Q. And took possession of it, arrested them, and brought them in? A. Yes, sir.

" Q. And at that time, of course, you had no search warrant? A. No, sir. We had no knowledge that this car was coming through at that particular time.

" [Redirect examination.] The lazyback was awfully hard when I struck it with my fist. It was harder than upholstery ordinarily is in those backs; a great deal harder. It was practically solid. Sixty-nine quarts of whiskey in one lazyback."

The negotiation concerning three cases of whisky on September 29th was the only circumstance which could have subjected plaintiffs in error to any reasonable suspicion. No whisky was delivered, and it is not certain that they ever intended to deliver any. The arrest came two and a half months after the negotiation. Every act in the meantime is consistent with complete innocence. Has it come about that merely because a man once agreed to deliver whisky, but did not, he may be arrested whenever thereafter he ventures to drive an automobile on the road to Detroit!

5. When Congress has intended that seizures or arrests might be made upon suspicion it has been careful to say

so. The history and terms of the Volstead Act are not consistent with the suggestion that it was the purpose of Congress to grant the power here claimed for enforcement officers. The facts known when the arrest occurred were wholly insufficient to engender reasonable belief that plaintiffs in error were committing a misdemeanor, and the legality of the arrest cannot be supported by facts ascertained through the search which followed.

To me it seems clear enough that the judgment should be reversed.

I am authorized to say that MR. JUSTICE SUTHERLAND concurs in this opinion.