**UNITED STATES v. ROGERS et al., and five other cases.**

**VOLSTEAD TRUCK SEARCH AND SEIZURE CASES.**

Nos. 2355b, 2705b, 3031b, 3351b, 3357b, 3359b.

District Court, D. New Jersey.

Nov. 9, 1931.

Phillip Forman, of Trenton, N. J., for the United States.

Frederick M. P. Pearse and George R. Sommer, both of Newark, N. J., for defendants.

BOURQUIN, District Judge.

In these six cases, defendants charged with unlawful possession and transportation of intoxicating beverages contest nothing but the lawfulness of search, seizure, and evidence so secured, save Starr contends in any event he is not guilty.

Adverting to them in order, in the first or Rogers case it appears that July 22, 1930, 5 a. m., a state trooper patrolling a Jersey highway met a truck which was of Pennsylvania license plates, unknown to the trooper, "appeared suspicious," and as he lawfully might for various reasons pursuant to local law, blew his whistle in signal to stop. The truck failed to comply, he pursued, drove alongside, and, gradually crowding the truck towards the gutter, compelled compliance. The trooper then became cognizant of the odor of alcohol, found defendants upon the truck, was by Rogers told the cargo was furniture, discovered was intoxicating beverages, and arrested defendants and seized truck and cargo for violation of the Volstead Act instead of local law, as were his instructions.

In the second or Burkis case, the evidence is in the nighttime October 18, 1930, one of Jersey's police patrolling the Brunswick Pike overtook a large truck and observed a light within it. Lights inside not usually seen, he watched, saw no flames or smoke, then directed state troopers to stop it as they did. Aboard were found defendants, Burkis driving and without the requisite licenses, an electric light inside, and a cargo of intoxicating beverages. The officer testified he had the truck stopped because the inside light was unusual, to advise the driver "something wrong," did not think of liquor, and after seizure and arrest, called the prohibition agents as he "generally" does, but not to help "the United States Government any more than the state." The police further testify on cross-examination that they remember no conversation with Starr who rode with Burkis, no claim he was a passenger "picked up" on the road, were no questions asked. Starr testifies it was raining that night, he was looking for work, was walking and hitch-hiking from Newark to Trenton, his home, was given a lift by Burkis, a stranger to him, and he knew nothing of the liquor cargo. He did not call Burkis and the latter did not testify.

The evidence in the third or Strogan case is that about 1:45 p. m., March 31, 1931, in Perth Amboy, prohibition agents noticed a truck, one of them remembered having seen at an "alleged beer drop" in Camden, drive to a "saloon" in "outward appearance" back to the curb, and the driver, defendant Strogan, walk to the rear. Turning their car to approach, the agents observed the driver "pulling away from the saloon." They followed the truck, which stopped when they blew a whistle. In response to their inquiry, the driver said he had "twenty halves," whereupon they opened the truck, discovered a load of beer, seized it, and arrested defendant.

In the fourth or Clarkson case, Scanlan, prohibition agent, testifies that June 7, 1931, his superior advised him he was informed trucks of description conforming to that herein later seized were expected to pass over a certain highway with cargo of illicit beer; that they stationed themselves to watch for them; that about 6 a. m. and after the agents had captured one truck, the truck involved came along, the agent blew his whistle, the truck stopped, a "rider" ran for the woods and escaped, defendant professed ignorance of his load, was merely employed to make the drive, made no protest, the agents opened the truck, discovered its cargo of illicit beer, arrested defendant, and seized the liquor.

In the fifth or Moore case, Scanlan also testifies that on like information on the day last aforesaid and 5:40 a. m. the truck came along as expected, the agents followed, stopped it, found defendant driving, who declared it had been intrusted to him loaded to deliver to some one who would meet him in Atlantic City, and upon opening it, the agents discovered a cargo of 107 half barrels of illicit beer; and that this was the first truck by them stopped that day.

In the last or Grunwald case, Broderick, prohibition agent, testifies that May 30, 1931, his superior informed him he had definite information and description that the truck of the instant case was coming with a load of beer; that in wait at 4 a. m. they saw it approaching, he blew a whistle, it stopped, and to his inquiry, the driver defendant answered he had 65 half barrels of beer; and that thereupon arrest and search followed, the truck by him opened verified the driver's answer, and seizure was made. Defendants object to the testimony in respect to information, for that sources, methods, and names are not given; and they object to all the evidence and move to suppress and return it, upon the ground was secured by search and seizure which is unreasonable and forbidden and by the Fourth Amendment, citing Carroll's Case, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, and Gambino's Case, 275 U. S. 310, 48 S. Ct. 137, 72 L. Ed. 293, 52 A. L. R. 1381. See also Husty's Case, 282 U. S. 694, 51 S. Ct. 240, 75 L. Ed. 629, 74 A. L. R. 1407. The objections are overruled, motions denied, and defendants and each of them found guilty as charged.

These arrests, searches, and seizures were made upon probable cause to believe felonies were in commission as they in fact were, in circumstances requiring the officers, police, or agents, to thus discharge their official duty, and are not "unreasonable" within the import of said amendment. See Husty's Case, 282 U. S. 694, 51 S. Ct. 240, 75 L. Ed. 629, 74 A. L. R. 1407. "'Probable cause,' according to its usual acceptation, * * * imports a seizure made under circumstances which warrant suspicion." Locke's Case, 7 Cranch, 348, 3 L. Ed. 364—the great Marshal's definition.

In lawful discharge of their office, the police in the Rogers and Burkis cases stopped the trucks, "night prowlers" at common law, incidentally discovered federal felonies being "committed," and, as by federal statutes was their bounden duty (18 USCA § 251), disclosed the fact to federal authorities; Whether the disclosure was by instructions or custom is immaterial, for the statutory obligation is superior to either and by neither is it impaired. In any event, no evidence of collusion appears, and even suspicion is dispelled by the presumption of official duty regularly performed, so nothing precludes the United States from use of evidence thus secured.

In respect to Starr, he was the out rider accompanying a large cargo of 291 cases of intoxicating liquors, and in the circumstances his belated and uncorroborated account is discredited and insufficient to raise reasonable doubt that he was associated in the guilty enterprise.

In any case, officers act upon appearances. Probable cause is nothing but appearances and the bona fide inference of the officers. Never have they more than appearances to create belief of crime in commission and to inspire their action. Those in Strogan's case sufficed to that end, even before, he informed them he was committing a felony. At that moment, irrespective of what passed before, the officers were bound to search and seize as they did. If the whistle in obedience to which Strogan stopped was a technical trespass as argued, it no more invalidated what followed than did the graver trespass in Hester's Case, 265 U. S. 58, 44 S. Ct. 445, 68 L. Ed. 898. In the Clarkson, Moore, and Grunwald cases the information upon which the agents acted was sufficiently accurate to enable them to apprehend the very trucks to them described. Nothing more

is necessary to constitute probable cause. See Husty's Case, supra.

The failure of the government to disclose by whom it was informed is immaterial. To inform is a statutory duty, and sound public policy forbids exposing informers to possible, even probable evil consequences.

In determining probable cause, the great volume of illicit beer traffic upon Jersey highways, its strategy, the experience and skill of the officers, and other circumstances must be taken into account. And it must be remembered not the innocent but the guilty complain of official efficiency. Never are the guilty satisfied with official methods which unmask and bring them to account. To the guilty it is a gross outrage that their cloak of respectability fails to deceive vigilant officers. So here as too common, the strategy of the guilty is to divert attention from themselves by putting the officers on trial. In these prohibition or at least Volstead days, that is the favorite outdoor sport of old John Barleycorn. A great lover of the Fourth and Fifth Amendments, is old John. He has become (God help us) the principal champion of them.

In forty years of bench and bar the writer has never known an innocent man appeal to the unreasonable search and seizure clause of the Constitution. That is true of the cases in general, but now, constantly and vociferously does old John invoke it and demand its vindication in his behalf. It was designed to be a shield of defense for the innocent; old John has converted it to a spear of aggression for the guilty.

And the amount of judicial sanction his arrogance has received, is one of the most shocking and alarming developments of the prohibition experiment.

It is asserted without fear of successful contradiction that in old John's behalf has been a construction of the Fourth and Fifth Amendments which never has been and never will be extended to any other variety of criminal. For lively old John substitute moribund John Smith, and who has the temerity to contend the result of the cases would have been the same? Had the dead body of a human apparently murdered been found in any the instant cases, unreasonable search and seizure would never have been thought of, much less advanced in defense. And what court would pervert principle, outrage decency, defeat justice, and

wrong society to suppress and restore the evidence to defendants?

It is true a policeman's lot is not a happy one, and nobody loves the officers who enforce the law and keep the peace. To hector and abuse, to excite suspicion and prejudice, to handicap, intimidate, discourage, and defeat, is the first line of defense of criminals, and unhappily popular with many, if not most others. So far has this been carried in and out of court, that the president of the nation has been constrained to appeal for justice for the police. If America is the most criminal country on earth (and it is), if the laws herein are most poorly enforced and justice most weakly administered (and they are), the aforesaid reprehensible treatment of officers of the law is a large contributing cause. Prohibition and other federal agents are national police. And the police in general, representing and the embodiment of the power, dignity, and hónor of government, are all that stands between organized society and anarchy.

Their own merits, the administration of justice, and the best interests of society demand that fair treatment for the officers of the law which the President invoked. The defendants will appear for sentence on Friday, the 13th instant.