## UNITED STATES v. 135,019 GALLONS, MORE OR LESS OF WINE, ETC.
### No. 720.

District Court, N. D. California, N. D.
Nov. 23, 1931.

George J. Hatfield, U. S. Atty., of San Francisco, Cal., and Albert E. Sheets, Asst. U. S. Atty., of Sacramento, Cal.

Bradford Melvin and Wallace Sheehan, both of San Francisco, Cal., for claimant.

ST. SURE, District Judge.

A libel of information was filed praying for the forfeiture and condemnation of intoxicating liquor and personal property, generally described as 135,019 gallons of wine, one continuous still, and property designed for the manufacture of liquor. The liquor and property are particularly described in the amended libel. It is alleged that said liquor and property were unlawfully possessed and designed and intended for use in violation of the National Prohibition Act, and also in violation of the internal revenue laws. A seizure of the liquor and property by officers of the government was based upon illegal sales of intoxicating liquor. Upon seizure, the liquor and property were taken into actual possession, custody, and control by government agents, were so held when the libel was filed, and are now so held.

Process was issued and served upon Manuel I. Silva, who answered, claiming ownership, attacking the jurisdiction of the court, admitting the seizure of the property by government agents, but asserting that such seizure was illegal, denying that said intoxicating liquors and personal property described in the libel were unlawfully or wrongfully manufactured or possessed and intended for use in violation of any laws of the United States, and alleging that said liquors and property were possessed and intended for use by claimant lawfully and legally and in accordance with the laws of the United States.

The case came on for hearing, a jury trial having been expressly waived. Prior to the trial, claimant filed a motion to suppress the evidence which was obtained through the search and seizure. The court reserved ruling on the motion and heard the case upon the merits.

The evidence shows that Manuel I. Silva, in February and March of 1930, and for a long time prior thereto, owned and operated near Sacramento, under government permits, a large bonded winery, an alcohol distillery, and a wine syrup manufacturing plant. The winery had a capacity of 175,000 gallons. Wines were to be manufactured for nonbeverage purposes on the bonded winery premises subject to internal revenue laws. The alcohol manufactured was to be used exclusively in fortifying wines. The wine syrup produced was to be used in the manufacture of food products. Manuel I. Silva's brother, King Silva, and one John Mendonca worked in the winery, while Manuel I. Silva attended generally to its management.

One John R. Bell, a resident of Sacramento, was specially employed by the Prohibition Department to act as an undercover agent. On February 17, 21, and 28, 1930, Agent Bell went to the Silva winery, and on each occasion met Manuel I. and King Silva in the office, talked with both about the purchase of wine, and purchased five gallons of wine, paying therefor the sum of $15. Each transaction was almost identical. Upon each occasion the wine was delivered by Agent Bell with a report of the transaction to Wayne Kain, special agent of the United States Treasury Department. Again on February 25, 1930, Agent Bell visited the winery, this time in company with Claude W. Ottman, a prohibition agent. Agent Bell had in his automobile five one-gallon jugs. Agent Bell went into the office and there found Manuel I. and King Silva. He asked if he might purchase some wine, and Manuel I. Silva assented. Ottman saw Manuel I. and King Silva in the office of the winery, saw Agent Bell and King Silva take the jugs out of the back of Agent Bell's automobile, and go into the winery. In a few minutes Agent Bell and King Silva came out of the winery carrying the jugs of wine which were placed in Agent Bell's car. Agent Bell handed a $20 bill to King Silva, who, having no change upon his person, went into the office and soon returned and handed Agent Bell $5. Upon this occasion King Silva told Agent Bell never again to bring anybody with him to the winery. This transaction, like the others, was reported to Special Agent Kain.

Again on March 7th Agent Bell visited the winery and made a purchase of wine. Before going to the winery Agent Bell was given one ten and one five dollar bill which had been marked. Concerning what transpired upon this occasion, Special Agent Kain testified as follows: "I followed a car containing J. R. Bell and watched him drive into the winery premises. I kept those premises under observation, and through the hedge saw Mr. Bell and King Silva enter the winery proper. I saw Mr. Bell place in the back of his car five packages and saw him raise the hood of his car, which was a prearranged signal. I then drove on to the winery premises, looked in the back of his car, saw five one-gallon bottles of wine. I placed Manuel and King Silva under arrest and from King Silva's pocket I took one ten and one five dollar bill which I had previously given Bell and marked and noted the numbers. I then searched the winery office and seized the papers which were used in conjunction with the operation of the winery."

Prohibition Agent Phillips and other agents accompanied Special Agent Kain when he entered the winery premises. The testimony of Kain was corroborated by Agent Phillips.

When Special Agent Kain arrested Manuel I. Silva, he asked Silva what he had been doing, and he replied: "Well, a man will take chances. There's no use crying over spilt milk. You've got me this time."

When Special Agent Kain entered the winery, after the arrest, he found that the wine syrup there was being used to manufacture wine in violation of law. He testified that the syrup could be turned into wine, and that "the method generally used is two parts water and one part wine, and it ferments out into a dry wine. We found," further testified Special Agent Kain, "that the hose was connected to one of the syrup tanks in the syrup warehouse, and was attached to a pump, and from that pump the hose ran through an open door from the bonded winery premises and into one of the fermenting vats. In this vat was approximately twelve hundred gallons of what had been syrup, but was fermenting into a dry wine." The alcoholic content of this wine was found to be 11 per cent.

The witness talked with Manuel I. Silva about this liquor, and Silva "said that he had intended to make of that a syrup with a heavier sugar content, and we asked him where the sugar was he was going to use, and he said he hadn't sent for it yet and there was none on the premises. Then we asked him why, if he was going to make a syrup of heavier content, was he first letting it ferment, and he made no answer."

Claimant, for support of his case, relied, in the main, upon the affirmative testimony for the government, above narrated. He introduced in evidence a map made by an engineer showing the location of the Silva Bros.' Winery and surrounding premises. G. E. Harrison and J. S. Bell each testified that he was at the Silva place on the morning of the arrest and seizure, and that Manuel I. Silva was not near the office or winery at the time the illegal sale of wine was made, but that he appeared on the scene immediately thereafter. The testimony of Agent John R. Bell is to the contrary. Special Agent Kain testified that Manuel I. and King Silva were both present when he arrived on the winery premises, and that, after looking into Agent Bell's car and seeing the wine which had been illegally sold, he then and there placed both men under arrest, searched King Silva, and found the marked bills; thereupon addressed Manuel I. Silva, asked him what he had been doing, and received the reply: "Well, a man will take chances. There's no use crying over spilt milk. You've got me this time."

Manuel I. and King Silva were in attendance at court throughout the trial. Manuel I. Silva took the witness stand, but confined his testimony to a statement that the first time he ever saw Agent John R. Bell was on the day of the arrest and seizure.

"When was the first time you ever saw J. R. Bell?" he was asked. "Well, I just see him the day on March 7th because Mr. King took me outside and present me to him, that is the first time I see him."

King Silva was not called as a witness.

Claimant moved to suppress the evidence on the grounds that the agents entered the winery premises on March 7, 1930, without a search warrant and without a warrant of arrest for any person and made a seizure thereof; that no crime was committed in the presence of the officers, nor did the officers have probable cause to believe that claimant or any other person had committed a crime; that the arrest of claimant and others on March 7, 1930, was in violation of their rights under the Fourth and Fifth Amendments to the Constitution of the United States.

Although the libel alleges a violation of both the National Prohibition Act and the internal revenue laws, I think the government is limited on its rights of forfeiture to the terms of section 25 of title 2 of the National

Prohibition Act (see section 39, title 27, US CA). So much of section 25 as is pertinent here reads as follows: "It shall be unlawful to have or possess any liquor or property designed for the manufacture of liquor intended for use in violating this chapter or which has been so used, and no property rights shall exist in any such liquor or property. A search warrant may issue as provided in sections 434 to 454, and 456 of Title 17 [these sections should be 611 to 631, and 633 of Title 18], and such liquor, the containers thereof, and such property so seized shall be subject to such disposition as the court may make thereof. If it is found that such liquor or property was so unlawfully held or possessed, or had been so unlawfully used, the liquor, and all property designed for the unlawful manufacture of liquor, shall be destroyed, unless the court shall otherwise order. * * * "

■ Claimant, citing the section above quoted, contends that the search and seizure were unlawful because made without a search warrant. In support of his contention he cites Ghisolfo v. United States (C. C. A.) 14 F. (2d) 389, 390. In the Ghisolfo Case a libel was filed, as here, under section 25 of title 2 of the National Prohibition Act, but the libel failed to allege the seizure of the property sought to be condemned under a search warrant or otherwise, and no such seizure was in fact made. Judge Rudkin wrote the opinion in the case for our Circuit Court of Appeals, and in discussing section 25 he uttered the dictum: "It simply provides that the outlawed property may be seized under a search warrant, issued as provided in the Espionage Act, * * * and it is only 'such property so seized' that is subject to the disposition of the court. Such is the plain language of the statute and such has been the construction placed upon it whenever called in question." This statement had the force of law in this circuit until Judge Dietrich wrote the opinion in The Ng Ka Py Cases (C. C. A.) 24 F.(2d) 772, 773. There the court discussed and repudiated the Ghisolfo Case. It said: "If it be conceded that the proposition [the specific contention being that, because the liquors were not seized under a search warrant the court is without the power to entertain the action] finds a measure of support in certain language used in Ghisolfo v. United States (C. C. A.) 14 F.(2d) 389, it is to be noted that there no seizure at all had been made, by search warrant or otherwise, and there was wholly wanting the jurisdictional prerequisite of possession of the offending res. The language relied upon was therefore

unnecessary to the decision and must be regarded as obiter. That the real point intended to be decided was that possession is a necessary prerequisite to the maintenance of such an action becomes clear upon reference to the citations, which with a single exception are pertinent only to that question."

The third sentence of section 25 is the one under which the court proceeds in the exercise of its jurisdiction to condemn property or liquors outlawed under the first sentence of the section; and in The Ng Ka Py Cases, supra, the Circuit Court of Appeals unquestionably held that a seizure under a search warrant was not essential to its exercise of jurisdiction under section 25 in a proceeding to condemn contraband liquors, for it said: "All that we decide is that, the goods being contraband and subject to forfeiture, the seizure thereof, rightfully made, though without a search warrant, furnished ample basis for invoking the power of the court to adjudge forfeiture." It expressly refrained from deciding "whether, in a case where possession is obtained through an unlawful search, the unlawfulness forbids jurisdiction, or only affects incidents of its exercise"; it refrained from so doing for the reason that it found the seizure there under consideration a lawful one though not under a search warrant. See Strong v. United States (C. C. A.) 46 F.(2d) 257.

■ It therefore clearly appears that this case resolves itself into a question whether the seizure was "rightfully made"—whether the seizure was made as an incident to a lawful arrest. If the arrest was justified, under the facts presented to the personal knowledge of the officers, then the search and seizure of the liquor and property were properly made incidental thereto.

■ Section 103, Regulation 2, Bureau of Prohibition, United States Treasury Department, under which claimant held the permits, gave the officers the right to enter upon the bonded winery premises and make a complete inspection. This regulation has the force of law. Shapiro v. Lyle (D. C.) 30 F.(2d) 971, 973. The officers therefore were rightfully upon the winery premises.

■ The usual rule is that an officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence; and the officer may search and seize the instrumentalities of the crime as an incident to a lawful arrest. Carroll v. United States, 267 U.

S. 132, 156, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790; Agnello et al. v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409; Weeks v: United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Marron v. United States, 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231.

■ In the instant case, since the facts show the offense to have been committed in the presence of the officers, it makes no difference whether it was a felony or a misdemeanor. Here we are not concerned with probable cause, since knowledge of the offense was conveyed to the officers through their senses. Upon the evidence thus presented the Silvas could have been arrested for (1) sale in violation of section 3, title 2, National Prohibition Act (section 12, title 27, USCA); (2) an abuse of their permit privilege under section 29, title 2, National Prohibition Act (section 46, title 27, USCA); (3) a conspiracy to violate the National Prohibition Act in violation of section 37 of the Criminal Code of the United States (18 USCA § 88). Furthermore, the Jones-Stalker Act (27 USCA §§ 91, 92) makes the manufacture of intoxicating liquors a felony. All that the officer would need to show in justification of the arrest would be that he had reasonable grounds to believe that the felony had been committed. United States v. Solomon (D. C.) 33 F. (2d) 193, 195.

Under the facts and circumstances presented in this case, I am of the opinion that the arrest was lawfully made, and that the search and seizure complained of followed as an incident to such arrest. The motion to suppress is denied, and an exception to the ruling is noted on behalf of claimant.

The liquor, wine syrup, and the property particularly described in the amended libel shall be forfeited to the United States and an order made condemning same. The said liquor and wine syrup shall be destroyed by the United States marshal of this district; the personal property designed for the manufacture of liquor, which said property may be put to lawful use, shall be sold at public auction by the marshal. The marshal, after deducting the expenses of keeping and guarding the property, the fee of the seizure, the costs of the sale, and the costs of this proceeding, shall pay the balance of the proceeds into the Treasury of the United States as miscellaneous receipts.

Findings and decree in accordance with the prayer of the libel and the views herein expressed.