243 So.2d 758

Michael G. SPURLIN

v.

STATE.

7 Div. 10.

Court of Criminal Appeals of Alabama.

Oct. 7, 1969.

Rehearing Denied Nov. 4, 1969.

Woodrow Albea and W. O. MacMahon, III, Anniston, for appellant.

MacDonald Gallion, Atty. Gen., and Lloyd G. Hart, Asst. Atty. Gen., for the State.

CATES, Judge.

September 25, 1968, a jury convicted Spurlin of robbery. Pursuant to verdict, the court sentenced him to ten years in the state penitentiary.

### I

A motion to suppress evidence obtained at a lineup involving appellant was filed and the trial court granted the motion and suppressed the lineup evidence.

### II

The following is a statement of the facts:

Hugh E. Edwards owned and operated a grocery store in Calhoun County. On the night of February 26, 1968, his store was robbed by two men with stockings over their faces. Edwards was made to lie face down on the floor by the two men. After taking $182.00 from the store, including a five dollar ($5.00) bill with a corner torn off, the men ran outside.

Darrell Chapel testified that he was in a lot near the store on the night of the robbery and saw two men come out of the store with stockings over their faces. After getting a short distance away from the store, the men removed the stockings. Chapel made an in-court identification of appellant as being one of these two men. He also identified the car these men left in as being a light-colored 1959 or 1960 Chevrolet automobile. Another witness had previously testified that a 1959 or 1960 Chevrolet, either blue or gray in color, was parked outside Edward's store on the night of the robbery.

R. C. Garmany testified that he had paid Edwards with a five dollar bill with the corner torn off the day before the robbery.

Officer Richard Flor testified that he received a radio message concerning a robbery. He stopped appellant's blue 1959 Chevrolet about a mile from Edward's store and questioned the driver and passenger. Officer Flor then placed both men under arrest for "suspicion" of armed robbery and proceeded to search them for weapons. On appellant's person, the officer found $88.10 ($41.00 down inside his pants, $45.00 in his right-hand pocket, four 50-cent pieces, and a dime) including a five-dollar bill with a corner torn off.

Both Edwards and Garmany testified that this five-dollar bill was similar to the one which had passed between them preceding the robbery. The money found on appellant was admitted into evidence by the court.

The defendant testified in his own behalf. His defense was alibi.

## III

Appellant contends that the arrest by Officer Flor was illegal and that, therefore, the money, particularly the marked five-dollar bill, found on the appellant was erroneously introduced.

Officer Flor testified that he had probable cause to arrest appellant for robbery at the time of the arrest because of information from a reliable informant. Therefore, the only issue in this case upon which a possible reversal would lie is whether or not Officer Flor had reasonable cause to arrest appellant without a warrant. Code 1940, T. 15, § 154, which reads as to felony arrests as follows:

"* * * or when a felony had been committed, though not in his presence, by the person arrested, or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it; or when he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or on a charge made, upon reasonable cause, that the person arrested has committed a felony."

Act No. 157, August 19, 1966 (The Stop and Frisk Act), reads in pertinent part:

"Section 1. A sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense, and may demand of him his name, address and an explanation of his actions.

"Section 2. When a sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county, or any highway patrolman or state trooper has stopped a person for questioning pursuant to this Act and reasonably suspects that he is in danger of life or limbs, he may search such person for a dangerous weapon. If such officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

Blackstone, citing Coke, Hawkins, Hale and other authorities, says:

"Arrests by officers without warrant may be executed by * * * 4. The constable, * * * hath great original and inherent authority with regard to arrests. He may, without warrant, arrest any one for breach of the peace, committed in his view, and carry him before a justice of the peace. And in case of felony actually committed, or a dangerous wounding, whereby felony is like to ensue, he may upon probable suspicion arrest the felon; and for that purpose is authorized (as upon a justice's warrant) to break open doors, and even to kill the felon if he cannot otherwise be taken; and, if he or his assistants be killed in attempting such arrests, it is murder in all concerned. * * *"

See also Beale, Criminal Pleading and Practice, § 20.

The search of a motor car without a warrant rests on expediency—particularly where time does not allow going for a warrant. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

We distinguish White v. State, 45 Ala. App. 1, 221 So.2d 117, because there was (a) a delayed search of White's person and (b) the officer found out later, i. e., after picking up White, by a radio message that

White was suspected in a burglary. Before the latter radio call, all the arresting officer was told was that he had missed one in a group. At that time, the only knowledge given by the police dispatcher was of the driver's getting gasoline and cigarettes without paying.

 We hold that a police radio message as to a *felony* involving fleeing suspects is sufficient to support a lawful arrest under § 154, T. 15, supra.

In reaching this conclusion, we do so unaided by the Stop and Frisk Act, supra.

We have carefully reviewed the entire record under Code 1940, T. 15, § 389 and consider the judgment below is due to be

Affirmed.

## APPENDIX

We set out the pertinent part of Officer Flor's testimony:

"BY MR. WILLIAMS:

"Q And, Now, as I understood you to say, you told us where you saw this defendant that night?

"A Yes, sir.

"Q How was he traveling?

"A In an automobile.

"Q What kind of automobile?

"A A '59 Chevrolet.

"Q Do you remember the color of it?

"A Yes, sir, blue.

"Q Was that a light blue or dark lime?

"A Kind of a blue-green.

"Q Mr. Flor, what did you do when you stopped this automobile?

"A I questioned the driver and the passenger.

"Q Tell us what took place at that time?

"A. The driver was questioned if he had any identification and he couldn't produce any identification and I asked him to step out of the automobile and he did. I could tell when he stepped out what he was wearing.

"Q What did he have on?

"A He had on a kind of light green colored pants and a short sleeve polo shirt, the driver had on. And he met the general description put out on the air.

* * * * * *

"Q Then, after your talk with the driver, did you ask the passenger to step out of the automobile?

"A He did so and I asked him to produce identification and he produced a driver's license, and I observed his clothing, and his general appearance.

"Q What clothing did he have on?

"A He had on, it was a dark jacket, I don't remember, frankly, what color the jacket was. He also had on gold corduroy trousers.

"Q What did you do then?

"A I placed the subject under arrest for armed robbery.

"Q Did you tell them that?

"A Yes, sir.

"Q What did you do then?

"A I proceeded to search the subjects for weapons, they were the ones that committed the armed robbery, as far as we knew.

"Q Did you find anything on them?

"A Yes, sir.

"Q You're talking about on the defendant?

"A Yes, sir, and also Forty-One Dollars down inside of his pants in the front stuffed down in here, and he had Forty-Five Dollars cash in his right-hand pocket and also had four Fifty Cent pieces and also had a Ten Cent piece.

"Q Now without going into the details of the other man, and at that time, did you search him?

"A The other defendant?

"Q Yes.

"A Yes, sir.

"Q Did you find any money on him?

"A No, sir.

"Q Not at that time?

"A No, sir.

"Q Did you later?

"A Yes, sir.

"MR. MacMAHON: I object to any testimony other than to Michael Spurlin; he is the only one on trial here today.

"THE COURT: Overruled.

"MR. MacMAHON: We except.

"Q Now, then, you told us about the money, where you found it, you described that on Michael Spurlin?

"A Yes, sir.

"Q What did you do with the defendant?

"A Brought him into custody and brought him to the Police Station.

"Q The money you found on Michael Spurlin, Mr. Flor, what did you do with it?

"A Well, I just gathered it up and kept it separate from and I just kept hanging on to it.

"Q Did you deliver this to anybody?

"A I delivered it to the Detectives' Office.

"Q Was that the same night?

"A Yes, sir.

"Q Was that shortly after you brought the defendant in?

"A Yes, sir, they were already down there at the police station when we arrived with the defendant.

"Q I believe you said you turned it over to the Detective Department?

"A Yes.

"Q Do you remember whether or not it was Chief Pate?

"A Yes, sir. Chief Pate and Detective Douglas.

"MR. WILLIAMS: That's all we have right now.

"CROSS EXAMINATION

"BY MR. MacMAHON:

"Q You told us that you were on duty on the 26th of February, 1968; around what time did this arrest take place?

"A Eight-fifteen P.M.

"Q At the time this arrest was made, was this crime being committed in your presence?

"A No, sir.

"Q No crime was being committed in your presence?

"A (Witness indicating moving head back and forth.)

"Q Did you see any attempt to leave the scene of the crime by the defendant here?

"A No, sir.

"Q Did you have a warrant for his arrest?

"A No, sir.

"Q *Did you base the information you had received on a reliable informant?*

"A *Yes, sir.*

"Q Somebody you relied on before, that does not work for the police force?

"A He works for the Police Department.

"Q He's not considered a reliable informant, is he?

"A *Yes, sir, I call him reliable.*

"Q And did you have any probable cause to stop this car and make an arrest; what was the defendant doing of an unusual nature, if anything?

"A The car wasn't doing anything of an unusual nature.

"Q You got the description that that two white male suspects were in a '59 or '60 Chevrolet, isn't that correct?

"A Yes, sir.

"Q What did you say when you arrested them?

"A I told both of them they were under arrest for suspicion of armed robbery.

"Q And you told them they were under arrest for suspicion of armed robbery, is that correct?

"A Yes, sir.

"Q So you weren't sure when you made the arrest, that was the automobile in question and you weren't certain these two individuals in the automobile were the persons who were supposed to have robbed the Mountainview Grocery Store, were you?

"A I had enough probable cause to believe they did.

"Q Why did you say suspicion?

"A I suspected they committed the crime.

"Q You thought they did?

"A It's not my job to prove them guilty.

"Q You said suspicion, you weren't sure they were the ones or not, you wanted to protect yourself?

"A In my own mind I thought it was them.

"Q Do you remember this hearing, the preliminary hearing, don't you?

"A The one over at the City Hall?

"Q That's right.

"A Yes.

"Q That you got called about the description of two white men suspects driving a '60 Chevrolet, color blue or green. What did you do after that, you said you were given other identification as to clothing; did they give you anything else that they were wearing?

"A No—

"MR. MacMAHON: That's all." (Italics added.)