THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
OTIS LEE THORNTON, Defendant-Appellant.

First District (5th Division)   No. 62470

Opinion filed March 25, 1977.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Salvatore R. Marzullo, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant was indicted with one Freddie Mines for murder and attempt armed robbery. In a separate trial, a jury found him guilty of both offenses, and he was sentenced to a term of not less than 16 years nor more than 50 years.

On appeal, defendant contends (1) a warrantless automobile search conducted by police was unlawful; (2) the arrest of Freddie Mines was without a warrant or probable cause; hence, the revolver seized from the automobile could not be justified as incident to Mines's arrest; (3) the arrest of defendant was without a warrant or probable cause and, therefore, statements given by him to police following the arrest were fruits of continuing police illegality; and (4) even if defendant's arrest was lawful, the statements were the product of being confronted with the unlawfully seized gun.

Prior to trial, defendant filed motions to suppress the use of the murder weapon recovered by the police, to quash his arrest, and to suppress the statements made by him while in custody.

At the hearing on the motion to suppress the use of the gun, Officer Nigro testified that while in a patrol car with a partner, Officer White, a radio message was received to watch for a 1963 gold Rambler automobile with a damaged right front fender that had been involved in a shooting. Shortly thereafter, he observed nearby an unoccupied car answering that description, and he and his partner set up a surveillance of the vehicle.

After 30-45 minutes, Nigro saw a young man enter the rear of the car, and when the officers attempted to get closer the young man, subsequently identified as defendant, had already left the car and disappeared into a building. Later, another man approached the car carrying what appeared to be a bumper jack and some tools. Nigro and his partner stopped this man as he placed the tools in the vehicle. Upon questioning this man, who was later identified as Mines, he said the car belonged to a friend and he was going to change the tire. Nigro then made a search of the vehicle and removed a gun from the slit of the rear seat. A shell was also found on the rear floor and a pellet in the front seat. When the gun was found, Mines was arrested.

Jessie Harris, defendant's mother, testified she owned a 1964 brown or beige Rambler. On the evening in question, she was in her second floor apartment and saw the police near her car. She asked them why they were "messing" with her car, but she denied telling them they could do what they wanted with her car or that she told any police officer that defendant and Mines had used the car earlier that day.

Officer Reynolds, who was assisting in the surveillance, testified that a woman called from a second floor apartment and said, "What are you

doing by my car?" He asked whether they could look through the car, and she replied in the affirmative. He also heard Officer Marrello say he would go upstairs and explain the circumstances to her.

The court denied the motion to suppress, and the hearing on the motion to quash the arrest of defendant followed, at which Officer White—who was working with Nigro—gave testimony that was substantially the same as that of Nigro. In addition, he said that defendant was in the apartment of Mrs. Harris when he went there with Officer Marrello. White heard Marrello ask her whether the car had been used earlier and heard her reply that defendant and Mines "were out with the car trying to get it fixed." At that point, one of the officers called up and told them that a gun had been found in the car, and defendant was then arrested.

The motion to quash the arrest was denied and the hearing on the motion to suppress defendant's statements followed, at which Officer White testified that he heard Marrello inform defendant of his rights, and Officer Reynolds then testified he was present when defendant gave a statement to Assistant State's Attorney Rocco. Prior thereto, he heard Rocco advise defendant of his *Miranda* rights and, after each right was explained, defendant said he understood it.

Rocco then testified he advised defendant of his rights at police headquarters, and defendant stated he understood them. He also told defendant's mother of her son's rights and that he wanted to take a statement from him. She told defendant to tell the truth. Defendant then made an oral statement to Rocco and, later, gave a court reporter statement. When Rocco left police headquarters, he didn't determine whether a judge was still sitting there, although he was aware that court was held in that building.

Officer Philbin testified that defendant gave three statements—one orally to him, one orally to Rocco, and later a court reporter statement was taken from him. The court denied the motion to suppress the statements, finding that they were made knowingly and voluntarily.

The testimony at trial was substantially the same as that adduced on the motions. In addition, however, Officer Reynolds testified that he was with another officer when he heard a gun shot and saw a black male running across the street and a man lying in the street holding his stomach. He put out a radio communication and, after being joined by Officers Nigro and White, he went to an alley about eight blocks from the shooting where he saw a 1963 or 1964 gold-colored Rambler. He also testified that the gun taken from the car was shown to defendant when he gave a statement to Rocco, and at that time defendant identified it as the weapon with which he shot Mr. Okamura.

Officer Marrello then testified that he and his partner, Officer Gall, were in a police vehicle in the vicinity of Madison and Paulina on the day in

question when he heard a shot fired and saw a black male run across the street. He reported that information by radio, and he and his partner then went to the scene of the shooting where, after talking to bystanders, he radioed a message to look for a 1963 or 1964 gold, four-door Rambler with two black males in it. They next went to the hospital where the victim had been taken and, upon their return to the area of the shooting, they saw a 1963 or 1964 gold Rambler in an alley behind the building at 2450 West Monroe. Later, he and Officer White went up to the apartment of defendant's mother, where she told them that defendant and Freddie Mines had used the car earlier that day. After an officer called up from the alley that a gun had been found in the car, they arrested defendant who was in his mother's apartment when the officers entered it. Defendant was informed of his rights and later, when Marrello and Gall were taking defendant to the station, they passed a car which resembled the vehicle involved in the shooting. When Marrello mentioned that fact, defendant said, "Okay, I did it." Marrello then testified that he inquired whether Mines was with him, and defendant said, "Yes, he gave me the gun." When Marrello asked what had happened, defendant replied that he pointed the gun at the victim and, when he raised his hands, the gun went off.

Marrello testified that later a written statement was taken from defendant, incorporating the above, and in it defendant additionally said that he did not have the gun when he talked with the girl; that the gun was given to him by Freddie who said, "Get him"; that at the time he went to get the man, the gun was cocked; and that the man swung at defendant but did not hit him, and at that time the gun went off. After this written statement was received in evidence, it was read to the jury.

The jury then found defendant guilty of attempt armed robbery and murder, with a recommendation of clemency.

OPINION

Defendant first contends the warrantless automobile search was unlawful because "the police had the parked and unattended car under surveillance for several hours prior to conducting the search."

■■ A warrantless search can survive constitutional inhibition only upon a showing that the facts bring it within one of the exceptions to the rule that a search must rest on a search warrant. (*Stoner v. California* (1964), 376 U.S. 483, 11 L. Ed. 2d 856, 84 S. Ct. 889.) In *Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, the court first articulated the exigent circumstances exception with which we are concerned here. In that case, a warrantless search of an automobile was upheld where probable cause existed and there were the additional circumstances of the automobile being stopped on a highway, where it

was not practical to obtain a warrant and it contained contraband which could have been removed or destroyed.

In *Cooper v. California* (1967), 386 U.S. 58, 17 L. Ed. 2d 730, 87 S. Ct. 788, the court in referring to its opinion in *Preston v. United States* (1964), 376 U.S. 364, 11 L. Ed. 2d 777, 84 S. Ct. 881, said:

> "We made it clear in Preston that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and pointed out, in particular, that searches of cars that are constantly movable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property." 386 U.S. 58, 59, 17 L. Ed. 2d 730, 732, 87 S. Ct. 788, 790.

Neither in his brief nor in his argument on the first contention here does defendant raise any question as to probable cause. He points out that the police had observed the parked and unattended vehicle and kept it under surveillance for about 2½ hours before it was searched. He concludes from this, "Since there were no exigent circumstances which would make it impractical to secure a warrant, the failure to do so compels the conclusion that the gun was seized in violation of the fourth amendment." We disagree. In effect, defendant argues that by the time the search of the car was made, any exigence that may have existed had passed, and a warrant could have been readily obtained. We think this argument is foreclosed by *Chambers v. Maroney* (1970), 399 U.S. 42, 26 L. Ed. 2d 419, 90 S. Ct. 1975, and *Cardwell v. Lewis* (1974), 417 U.S. 583, 41 L. Ed. 2d 325, 94 S. Ct. 2464. In *Chambers*, the court held that police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without obtaining a warrant, because probable cause still obtained. (399 U.S. 42, 52, 26 L. Ed. 2d 419, 429, 90 S. Ct. 1975, 1981.) In *Cardwell*, the court stated:

> "Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. * * * The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." 417 U.S. 583, 595-96, 41 L. Ed. 2d 325, 338, 94 S. Ct. 2464, 2472; *cf. Texas v. White* (1975), 423 U.S. 67, 46 L. Ed. 2d 209, 96 S. Ct. 304.

In the instant case, when the police first came upon the car in question, probable cause existed for its search because it matched the unique description of the vehicle used by the assailants in leaving the crime and

because the police could reasonably have believed the murder weapon was still in the car or that some other evidence might be found in it to assist in the identification of the offenders. Instead of a search at that time, the police placed the car under surveillance in the expectation that the former occupants might return to it. During this period of 2½ hours it remained possible for someone to enter the car and either drive it away or remove or destroy the evidence. Indeed, one of the offenders did manage to enter the car during this period of surveillance and leave it before the police were able to get to him. It appears to us that the conduct of the police in conducting a surveillance in an effort to apprehend the assailants, rather than to seize and search the car at the first possible moment, was a reasonable action. Moreover, it is our further belief that at the time of the search of the vehicle in question here, the exigent circumstances still existed; namely, that the car could still have been entered and either driven away or evidence removed or destroyed.

In view thereof, it is our opinion that the search of the vehicle in question was reasonable and that the gun found in the car was properly received in evidence.

Having so found, we need not consider an additional contention of defendant that the seizure of the gun was unlawful because the arrest of Freddie Mines was without warrant or probable cause.

■■ Defendant also contends that because his own arrest was without warrant or probable cause, the statements given by him were fruits of his illegal arrest. The State maintains that the police had probable cause to arrest him, and we agree. An arrest may be made without a warrant if a criminal offense has been committed and the arresting officer has reasonable grounds to believe that the person to be arrested has committed the offense. (*People v. Scott* (1968), 100 Ill. App. 2d 473, 241 N.E.2d 579; Ill. Rev. Stat. 1971, ch. 38, par. 107—2(c).) The question as to what information is sufficient to establish probable cause is dependent upon the facts and circumstances of each particular case. (*People v. McCrimmon* (1967), 37 Ill. 2d 40, 224 N.E.2d 822, *cert. denied,* 389 U.S. 863, 19 L. Ed. 2d 131, 88 S. Ct. 120.) In *People v. Payne* (1972), 6 Ill. App. 3d 378, 380, 286 N.E.2d 35—6, the court stated that:

"[I]t is not necessary that the information possessed by the officer be admissible at trial or that it be sufficient to prove the suspect guilty beyond a reasonable doubt. [Citations.] The test is essentially one of reasonableness. The actions of a policeman in making an arrest without a warrant must be judged in light of all the circumstances confronting the officer who while on the scene must make an immediate selection of a course of action which will preserve individual rights, but at the same time will prevent crime and lead to the apprehension of criminals. [Citation.]"

■■ In this regard, it has also been held that the officer's belief may be founded on factual and practical considerations of everyday life, upon which reasonable and cautious men—not legal technicians—act. (*People v. Colbert* (1973), 10 Ill. App. 3d 758, 295 N.E.2d 225.) Here, the police had been informed that the victim was shot by two young black males who fled in a 1963 or 1964 gold Rambler with a damaged right side. Shortly afterwards and near the scene of the crime, they observed a car answering that description. A young black male was then seen entering and leaving the car, and about an hour later another young black male was observed placing tools in the car. Before searching the car, they were informed by its owner that defendant had used it that day[1] and, finally, in their search of the car prior to defendant's arrest, they found the revolver. We conclude therefrom that there was probable cause for defendant's arrest and, as his alleged unlawful arrest was the sole basis for the suppression of his statements, we hold that they were properly received in evidence.

Further, having found that the gun was properly admitted, we reject the additional argument of defendant that his statements should not have been admitted because they were the result of his being confronted with the unlawfully seized gun.

For the reasons stated, the judgment is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.

---

[1] The State does not assert there was consent to the search.