LEIGH M. CLARK, Retired Circuit Judge.
This case has once before been before the appellate courts of Alabama on appeal to the Court of Criminal Appeals from a denial of appellant’s petition for writ of error coram nobis, which was affirmed by the Court of Criminal Appeals, without an opinion, at 443 So.2d 69, but which the Alabama Supreme Court on certiorari and on application for rehearing, reversed and remanded with directions to the Court of Criminal Appeals that it “allow petitioner an out-of-time appeal,” with which directions the Court of Criminal Appeals complied, as shown by its opinion at 460 So.2d 1213, as follows:
“Accordingly, the judgment of the circuit court denying the petition for writ of error coram nobis is reversed, and this cause is remanded to that court with directions that the petitioner be afforded an out-of-time appeal, pursuant to the authority expressed in Sturdivant v. State, supra, [460 So.2d 1210 (1984)].”
As the only two issues presented in the brief of counsel for appellant pertain to the same facts shown by the evidence, that the defendant’s automobile was stopped and its trunk searched by law enforcement authorities, and raise the same legal question, whether the stopping and search were in violation of defendant’s constitutional rights, we now set forth both of such issues as stated in brief of counsel for appellant:
I.
“WHETHER A SEARCH OF AN AUTOMOBILE TRUNK CONDUCTED BY POLICE OFFICERS WHERE THE OBJECT OF SUCH A SEARCH IS SOMETHING OTHER THAN CONTRABAND AND WHERE THE ONLY PROBABLE *1009 CAUSE FOR SUCH STOP AND SEARCH IS AN ALL-POINTS BULLETIN DESCRIBING A DARK COLORED AUTOMOBILE WITH TWO OCCUPANTS, CONSTITUTES A VIOLATION OF ARTICLE I, SECTION V OF THE ALABAMA CONSTITUTION.
II.
“WHETHER A SEARCH OF AN AUTOMOBILE TRUNK CONDUCTED BY POLICE OFFICERS WHERE THE OBJECT OF SUCH A SEARCH IS SOMETHING OTHER THAN CONTRABAND, IS AN ILLEGAL SEARCH IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA.”
Before commencing a discussion of either of the two issues presented by counsel for appellant, we should note that we have before us what purports to be a complete court reporter’s transcript of the trial of the case upon which the petition for writ of error coram nobis was based, which transcript discloses that there was considerable eyewitness testimony by three or more witnesses that the robbery alleged in the indictment occurred. We quote from the testimony of one of the witnesses, Ms. Constance James:
“Q. Where were you working on March 3, 1981?
“A. Cougar Oil No. 1.
“Q. And where is that?
“A. In Beloit.
“Q. What did you do there?
“A. I was cashier.
“...
“Q. Is it on — what highway?
“...
“A. 22.
“...
“Q. And what out of the ordinary happened on that evening?
“A. We were robbed.
“Q. What time was that?
“A. Approximately 7:30 or 7:20.
“Q. Do you remember who was there in the store with you when you were robbed?
“A. I and three other persons.
“...
“A. Well, I was standing behind the counter with my back turned to the door and this black guy ran in the store and said, ‘Give me all your money! Get down on the floor!’ At the time we didn’t think that he was serious, so we just stood there. He said, ‘I’m not joking, get down on the floor!’ So I got down on the floor.
“Q. And at that time, did you see he had a gun?
“A. Yes. He ran in the store with a gun in his left hand pointing it.
“Q. All right. Was there more than one man?
“A. No. At the beginning it was just one that ran into the store.
“Q. Just one that ran into the store?
“A. Yes.
“Q. Now tell us what the first man did.
“A. Well he pointed the gun. He didn’t point it directly at me, but it was like towards me, you know. Between me and the other lady that was sitting down. He said, ‘Give me all your money! Get. down on the floor!’ And we didn’t think he was serious. We thought it was a joke or something so we just stood there. He said, ‘I’m not joking, get down on the floor!’ So I got down on the floor.
“Q. Did you hear any gunshots at that point?
“A. Right after I got on the floor, yes.
“Q. All right. Who was standing right on the other side of the counter there, right in his way there?
“A. Levi Bennett.
“Q. And who else?
“A. Leola, she was standing right in front of him.
“Q. All right. Did you see what they did at that point?
“A. They hadn’t got down and I had got down and they were still standing there.
“Q. All right. Was there another person that came in the store after that?
“A. After I was down on the floor, yes.
“Q. Tell us what happened then.
*1010 “A. Well after I heard the shots, I heard the door come open and the cash register, it was closed. So he said, ‘Open the cash register.’ I got up and opened the cash register. He said ‘Get back on the floor.’ I got back on the floor and after then they went out.
“Q. All right. Did you get a good look at the man with the gun?
“A. Yes, I did.
“Q. Can you tell us a little bit about what he looked like?
“A. I didn’t notice his shirt, but I knew he had on dark clothing and he was a black male and he had a stocking cap on his head. It wasn’t really pulled tight, so it didn’t smear the looks on his face. It was just loose.
“Q. So you could see what he looked like through the stocking?
“A. Yes, I could.
“Q. What color pants did he have on?
“A. They were dark. I don’t remember what color they were. They were dark.
“Q. All right. But he was the one that fired the shot?
“A. He was the one that had the gun.
“Q. All right. Who actually took the money out of the cash drawer?
“A. It was the second one that come in there.
“Q. All right. Did he get any directions from the tall guy with the dark pants?
“A. No, they didn’t say anything to each other.
“Q. All right. How did they get the money from you?
“A. He said for me to get up and open the cash drawer.
“Q. He who?
“A. The first one that came into the store. I opened it and got back down on the floor. He just took it.
“Q. All right. So now, why did you give him the money?
“A. Because I didn’t want him to kill me.
“Q. All right. Do you see the man who had the gun and made you give him your money in the court room today?
“A. Yes, I do.
“Q. Will you point him out to the ladies and gentlemen of the jury.
“A. He’s right there. (Indicating).
“Q. All right.
“MS. SYDMORE [State’s attorney]: Let the record reflect that Ms. James is pointing to the Defendant.
“MR. BLAIR [Defendant’s attorney]: If I may, let the record also reflect that there are other — there is no other black male in the courtroom at this time.
“MS. SYDMORE: I see another black male.
“MR. BLAIR: Other than on the jury.
“MS. SYDMORE: I see a black male behind you, Mr. Blair.
“MR. BLAIR: All right. Now that’s who I was talking about, Ms. Sydmore, was Mr. Powell.
“Q. (Continuing): All right. Constance, did you see how they left?
“A. No, I didn’t.
“Q. What happened after that?
“A. Well I laid there for a few minutes and then I got up and I called the police.
“...
“Q. After the police came in, what happened?
“A. They asked me some questions and they asked how much money, you know, did they take?
“Q. How much money did they take?
“A. Approximately $360 to $370.”
Another witness for the State on the trial was Ms. Maggie Edwards. We quote excerpts from her testimony as follows:
“Q. All right. Did you have an occasion to be at the Cougar Oil No. 1 Station in Beloit on Highway 22 on March 3, 1981?
“A. Yes.
“Q. Do you remember about what time you got there?
“A. No, not exactly. I know it was around 7:30 or something going to 8.
“Q. What were you going to do there?
“A. Get some gas.
*1011 “Q. Did you see something unusual when you pulled up?
“A. Yes, I seen two guys going out the service station. I didn’t even go in. I attempted to get back in my car.
“Q. What was unusual about these two men out of the service station?
“A. Both of them had stocking caps on their head.
“Q. They were white or black?
“A. I couldn’t really tell whether they were white or black. They had stocking caps on their head.
“Q. Could you see anything on either of the men?
“A. No.
“Q. Could you see whether or not one of them was carrying a gun?
“A. I noticed one of them had something in his hand, but I didn’t know what it was.
“Q. But were the circumstances something that made you feel suspicious?
“A. Yes, the stocking cap.
“Q. What did you do then?
“A. I got inside my car.
“Q. What did the men do then?
“A. They were running away from me.
“Q. All right. Where did they run to?
“A. To another car that was parked down the street.
“Q. What did the car look like?
“A. It was a dark colored car like a Cadillac.
“Q. Where was it parked?
“A. It was parked between the street— down the street from the store.
“Q. Was it on the same side of the street as the store?
“A. Yes.
“Q. What way was it headed, the Orr-ville way or Selma way?
“A. Orrville.
“Q. Is that west?
“A. Yes.
“Q. All right. What was the lighting like out there so that they could see the car? How did you get a look at the car?
“A. I was coming to the store so I could see by my car lights. I noticed the car parked on the side of the street.
“Q. All right. So then after the men left, did you see them run and get in that car?
“A. I seen them running. I didn’t see them exactly get in that car. I know the car left.
“Q. What did you do after the car drove off?
“A. I came back to the service station to get gas.
“Q. All right. Did you go inside and see what happened?
“A. When I got to the door, one of the ladies from the store asked me did I see a car. I told them yes, that I just — I just told them that I wanted to get some gas and then she told me that the store had been robbed.
“Q. All right. So were you there when the police came?
“A. No.
“Q. Who did you give the description of the robbers to?
“A. The police came down there.
“Q. The police came and got you?
“A. Yes.
“Q. Did you give them a description of the car?
“A. Yes.
“Q. Was that the same night?
“A. Yes.
“Q. About how long after the robbery was that?
“A. Not quite an hour.”
Captain Joseph Jones of the Dallas County Sheriff’s Department testified that he was called to the scene of the robbery about 7:30 on the night of the robbery and that he obtained the description of “what the robbers looked like” and a description of “what the car looked like” in which they were traveling from the scene of the robbery.
The Uniontown Chief of Police, Chief Robert Hester, testified that on the evening of March 3, 1981, he received a bulletin on the police radio concerning the robbery that had happened at the Cougar Oil Station, that the bulletin “advised that it had just happened” and that “Cougar Oil *1012 Station in Beloit ... was robbed by two black males. One was wearing a maroon or red trousers and they were driving a dark blue or black Cadillac and they were armed.” Chief Hester testified further as follows:
“Q. All right. Based on that information, did you happen to stop any suspects that evening?
“A. We did.
“Q. Where was that and at what time?
“A. That was in Uniontown in the City Parking Lot.
“Q. About what time?
“A. Seems like to me it was around 10:45 or 11:00, somewhere in that neighborhood. I’m just not sure.
“Q. When you stopped these suspects, what did you do?
“A. We got them out of the car.
“Q. First of all, how did you come to see the car?
“A. The other police officers, unit two, we have a night watchman there and he called this car — he just saw the car went to the house and he said that there’s a black, a blue Cadillac that was pulling into the parking lot at this time with two black males in it.
“Q. All right. So what did you do?
“A. I got back in my car. It was only about less than half a block away from me anyway. At the time I arrived, I pulled into the parking lot. The subject in the Cadillac was in the other car. I don’t think they even saw me. They intended to come on out of the parking lot. They backed up to come back out and I pulled in front of them head-on and stopped them and this other car pulled up behind them.
“Q. So then what did you do?
“A. We got them out of the car and placed them under arrest.
“...
“A. We placed them under arrest. We searched them.
“Q. All right. What did you find in your search?
“A. We found money in the boots.
“Q. All right. Do you remember how much money?
“A. I didn’t count it, but after I turned it over to the investigator he told me about it. That it was somewhere in the neighborhood of $400.00
“...
“Q. All right. After you placed the Defendant and James Oliver under arrest, did you have occasion to search the car?
“A. I did.
“...
“Q. (Continuing:) Answer the question. What did you find in the trunk?
“A. A pistol.
“Q. Was there anything else that you found in the trunk?
“A. I believe that was all.
“Q. All right. Do you remember finding any live amunition in the trunk?
“A. That was with the pistol, right.
“Q. That was with the pistol?
“A. Right.
“Q. All right. Chief, I show what has been marked as State’s Exhibit F for identification purposes. Would you open this up and examine it carefully, please.
“A. (Complied).
“Q. All right. Do you recognize that?
“A. Looks like the gun I found in the car.
“...
“Q. All right. Would you open it up and check and make sure that it’s not loaded.
“A. (Complied).
“Q. It’s unloaded?
“A. Yes.
“...
“Q. Chief, you have State’s Exhibit L in your hand. Would you tell the ladies and gentlemen of the jury what that is. Hold it up for them to see.
“A. (Complied). This is all the ones that are not spent.
“Q. What are they, Chief?
“A. Those are bullets.
“Q. All right. Where did you get those bullets?
“A. Came out of the trunk of Sturdi-vant’s car.”
*1013 It is to be observed from the language of each of the issues presented in brief of counsel for appellant that appellant concedes in effect that if the search in the instant case of the trunk of the automobile involved had been for contraband the search would not have been unconstitutional. This for the reason, we think, that it is recognized that there are some cases of the United States Supreme Court, and its subordinate courts as well as authoritative cases of some of the appellate courts of states of the United States, that have definitely decided that when a search such as the one made in the instant case consisted of a search for contraband, the search did not constitute a violation of the Fourth or Fourteenth Amendment of the United States Constitution. However, counsel for appellant does not give us any reason why he insists that the search for anything other than contraband would be unconstitutional. There seem to be some cases that hold in effect that under the circumstances of the particular cases a warrantless search can be made into the trunk of an automobile while under the circumstances of other particular cases the search can be made of the interior of the automobile only and exclusive of the trunk. There have been so many reported cases in a variety of circumstances in which the question of whether the search of an automobile, including its particular parts, that it would unduly prolong this opinion to discuss most of them. As the search in the instant case was a “search incident to an arrest,” we now quote that which is found on the subject of Searches and Seizures at 68 Am. Jur.2d, § 92, as follows:
“The permissible scope of a search incident to an arrest is a question recognized by the Supreme Court of the United States to have prompted decisions ‘far from consistent.’ But in 1969, in Chimel v. California, 395 U.S. 752, 23 L.Ed.2d 685, 89 S.Ct. 2034, reh den 396 U.S. 869, 24 L.Ed.2d 124, 90 S.Ct. 36, the court discussed the history of its holdings on the question, beginning with the 1914 origin of the doctrine of search incident to arrest, traced the fluctuations in the law since that time, and concluded, overruling earlier decisions not in accord, that the scope of the search incident to arrest must be limited to the arrestee’s person and the area within his immediate control. The court explained that when an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that he might use to resist arrest or effect escape, since otherwise the officer’s safety might be endangered and the arrest might be frustrated. In addition, the court said, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee’s person to prevent its concealment or destruction. And the court remarked that the area into which an arrestee might reach in order to grab a weapon or evi-dentiary items must be governed by the like rule. Accordingly, the court concluded that there is ample justification, in a search incident to an arrest, for the search of the arrestee’s person and the area ‘within his immediate control’ construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence. On the other hand, the court stated, there is no comparable justification for routinely searching any room other than that in which the arrest occurs, or for searching through all of the desk drawers or other closed or concealed areas in that room itself,.such searches, in the absence of well recognized exceptions, being permitted only under the authority of a warrant.”
We find no authority in brief of counsel for appellant to the effect that the search of the trunk that revealed the pistol and bullets that almost certainly were in the hand of one of the two robbers of the Cougar Oil Station at the time of such robbery constituted an unconstitutional search and seizure, but counsel for the appellee cite United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), in support of the contention of ap-pellee. We quote from the majority opinion in United States v. Ross as follows:
*1014 “The exception recognized in Carroll [Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543] is unquestionably one that is ‘specifically established and well delineated.’ We hold that the scope of the warrantless search is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause could justify the search of a lawfully stopped automobile, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.”
We conclude that the search of the trunk of the automobile in the case sub judice did not constitute a violation of Article I, Section V, of the Alabama Constitution, or of the Fourth or Fourteenth Amendments to the Constitution of the United States.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur with PATTERSON, J., concurring in result only.