**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Glenn E. JAMERSON, Defendant–Appellant.**

**No. 02–6252.**

United States Court of Appeals, Sixth Circuit.

June 25, 2004.

Before: BOGGS, Chief Circuit Judge; KENNEDY, Circuit Judge; and RUSSELL, District Judge.*

KENNEDY, Judge.

Defendant Glenn E. Jamerson challenges the district court's refusal to grant his motion to suppress evidence found during the warrantless search of his vehicle. Because we find that the police had probable cause to search Defendant's vehicle based on a cooperating witness' tip, we **AFFIRM**.

## BACKGROUND

This is an appeal by Defendant. Glenn E. Jamerson, arguing that the district court erred in not suppressing the evidence seized from a search of Defendant's vehicle on October 5, 2001. The search was made without a warrant. However, the district court, adopting a magistrate judge's findings, concluded that the police had probable cause to search the vehicle based on a cooperating witness' information.

The facts in this case are not in dispute. Todd Lee, a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") testified that on October 3, 2001, the DEA office in Knoxville. Tennessee received an anonymous call stating that William Armstrong.[1] located at 234 Better Chance Lane in Lake City. Tennessee, was involved in distributing cocaine. Lee, along with SA James Blanton and Task Force Agent Lisa Carroll, went to Armstrong's residence, a traile. Armstrong gave verbal consent to search his trailer, and the agents asked for, and received, written permission to search Armstrong's trailer for cocaine. During the search of the trailer, the agents, in fact, found a small amount of cocaine in the bathroom. At that point, Armstrong "volunteered he had another approximately one ounce of cocaine stored in a barrel in his backyard, which he uses to burn his trash." SA Blanton went outside, looked in the barrel, and discovered approximately one ounce of cocaine hidden in the barrel, thereby verifying Armstrong's information.

The agents asked Armstrong if he were willing to cooperate by identifying his source for the cocaine. Armstrong agreed and told them that on Friday, October 5, 2001, two days later, his source would be traveling from Atlanta. Georgia to Jack Covington's[2] residence to supply Armstrong with additional six ounces of cocaine. SA Lee testified that Armstrong specifically named the Covington residence as the location of delivery. Although Armstrong did not know the name of his source. SA Lee testified that Armstrong provided some other information about this source. Armstrong indicated he had received cocaine from this source on prior occasions: that this source was a white male who would usually travel alone in either a small red car or a newer model black pickup with tinted windows. Both vehicles had Georgia license plates. Armstrong stated that he and the source would meet at Covington's residence to transfer cocaine. Although Armstrong did not have the street address for Covington's residence, he gave the agents specific directions on how to get there. He also provided the agents with Covington's telephone number. SA Lee used the number

---

* The Honorable Thomas B. Russell. United States District Judge for the Western District of Kentucky, sitting by designation.

1. Mr. Armstrong is a co-defendant of Defendant Jamerson.

2. Mr. Covington is also a co-defendant of Defendant Jamerson.

to obtain subscriber information, which confirmed that Covington's residence was at 1227 Salem Church Road in Greenback, Tennessee. When the agents used the directions provided by Armstrong, they arrived at that very same location.

SA Lee indicated that Armstrong had told them that he would receive a phone call before Friday. October 5, 2001, verifying the date and time that the source would be arriving at Covington's residence. On October 4, 2001. Armstrong contacted SA Blanton and stated that the source would be arriving at Covington's residence on Salem Church Road at approximately 3:00 p.m. on October 5. On October 5, 2001. SA Lee, accompanied by Task Force Agent Jerry Orr, Special Agent Phil Rust, Task Force Agent Lisa Carroll, and Blount County K–9 Officer Bob Suarez, began surveillance in the area of the Covington residence at 10:30 a.m.

At approximately 1:20 p.m., Covington and his wife left their residence and began traveling down Salem Church Road to Morganton Road. SA Lee followed them for approximately five miles when they immediately turned around and returned to their residence. At approximately 1:30 p.m., they left the residence again and traveled down Morganton Road, eventually going to Knoxville, Tennessee, where they met with an unknown black male. SA Lee asked for assistance from some Blount County agents in the surveillance of Covington.

At approximately 2:58 p.m., SA Lee received a radio call from Agent Jerry Orr, who indicated that he was following a black pickup truck with Georgia license plates and that the truck was turning left onto Salem Church Road. SA Lee told Agent Orr to stop that vehicle. When SA Lee arrived on the scene, he parked in front of the truck. Agent Orr had already initiated the stop and was at the driver's side window of the pickup truck. SA Lee testified that the vehicle was a newer model, black GMC single cab pickup with tinted windows and Georgia license plates. Agent Orr handed SA Lee the Georgia driver's license of the driver. Defendant Jamerson. SA Lee asked Defendant where he was going. The latter replied that he was going to see his friend, Jackie Covington. SA Lee then explained to Defendant that they had received some information that he would be transporting cocaine into this area and asked him if he knew anything about that Defendant replied that he did not. SA Lee asked for consent to search Defendant's vehicle, but the consent was refused. SA Lee then told Defendant that a drug K–9 was traveling to the area; that he would be there shortly; and that they would let the dog walk around the truck; and if the dog did not hit on the truck, they would let him go.

K–9 Officer Robert Suarez arrived 3 or 4 minutes later. Officer Suarez brought his dog[3] to the front of the vehicle and started him down the driver's side of the truck. The dog was sniffing the door area and then leaped into the cab area of the pickup truck through the rolled-down window Officer Suarez got his dog to back out,

---

**3.** The magistrate judge heard testimony about the dog's qualifications from Don Blair, a Supervisory K–9 Enforcement Officer with the United States Customs Service in San Luis, Arizona, and Robert Suarez, a K–9 handler and trainer. Blair testified at length about the training process and informed the magistrate judge that a drug-detection dog is trained to find the odor of the substance, not the substance itself. Officer Suarez testified that his dog, "Recon," a Belgian Laekenois, has been with him for three years. Recon was certified in 1999 and has undergone continuous maintenance training on a weekly basis. Officer Suarez testified that during his 2001 training, Recon participated in 216 or 217 hides, and of those he made either 215 or 216 positive alerts, with an accuracy rate of

continued around the vehicle, and came around to the driver's side. The dog leaped on to the bed cover and tried to sniff the back glass of the pickup truck Officer Suarez brought the dog off the back of the truck and brought him again to the driver's side door. The dog alerted again. Officer Suarez opened the door, and the dog went back to the same location where he first alerted. Thereafter, Officer Suarez indicated that that was a good alert. Agent Orr started a search on the driver's side of the vehicle and Task Force Agent Lisa Carroll started a search on the passenger side. Agent Orr testified that they looked behind the seat where the arm rest would be and saw a box that had markings as tool parts. He also testified that it was his understanding that Armstrong had given information that the source would have cocaine in his truck in a parts box just like the one they found. The box was closed, but not taped. When they opened it, "there was a zip-lock baggie with six individual baggies of white powder." The drug evidence obtained from the defendant's truck was analyzed as cocaine hydrochloride and weighed approximately 164.6 grams [4] and had a purity level of 86%.

Agent Orr also testified that during their search they saw a firearm, a .380–caliber pistol, in the floor area toward the passenger seat from the console area, within reach of the driver's seat and with the handle toward the driver. He also stated that after photographing the weapon, he pulled it out of the holster and cleared it.

## ANALYSIS

The Supreme Court has long recognized that a vehicle may be searched without a warrant as long as there is probable cause to believe that a contraband is present inside the vehicle. *See generally Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Ross*, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

Defendant argues that the police lacked probable cause to search his vehicle because (1) the information from the informant was insufficient; and (2) the dog was an unreliable indicator. Having had the benefit of full briefing and oral arguments by both parties, we find that both the magistrate judge and the district judge were correct as a matter of law that there was sufficient probable cause to search the vehicle based on the informant's tip alone. Armstrong told the agents what type of a vehicle Defendant would be driving, that it would have tinted windows, that it would have a Georgia license plate, that it would be driven by a white male, who would be arriving at a residence on Salem Church Road at 3 p.m. This information was sufficient to justify the search of Defendant's vehicle. *See Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (finding probable cause where the police

---

99% in 2001. Officer Suarez also testified that during 2001, Recon was deployed thirty-nine times, and of those times, he alerted to narcotics thirty-two times. He also stated that of the thirty-two times, he alerted on "finds" twenty-nine times, giving Recon a 90.6% accuracy rate in the filed. Of the twenty-nine times that Recon had finds, actual drugs in sizeable amounts were found 12 times, stems and seeds (which were not seizable amounts of drugs) were found 10 times, an no drugs were found (but a verbal communication was given that at some point they had been there) the remaining 7 times. On cross-examination, counsel indicated that he counted forty-three separate instances when Recon alerted and that only in twenty-six times (or 60/4% of the time) were actual drugs found.

4. The magistrate judge noted that this weight translated to 5.8 ounces of cocaine. As stated above, Armstrong indicated that the source would be delivering 6 ounces of cocaine.

received an anonymous letter informing them about the details of an upcoming criminal activity even though not all of the details in the letter came true). Here, all the details were true, the informant was identified, and his possession of drugs verified that he had information about the method of purchase.

Because we find that there was probable cause to search Defendant's vehicle based on the Armstrong's information, we agree with the district court that there is no need to address Defendant's argument about the dog's qualifications which simply bolstered the reliability of the information provided by Armstrong.

## CONCLUSION

For the reasons stated above, we affirm the district court's denial of Defendant's motion to suppress evidence found during the warrantless search of Defendant's vehicle.